QUINN EMANUEL URQUHART &
SULLIVAN, LLP
 David Eiseman (Bar No. 114758)
  davideiseman@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600

 Robert Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
 Aaron Perahia (Bar No. 304554)
  aaronperahia@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000

 Evan Pearson (*pro hac vice*)
  evanpearson@quinnemanuel.com
300 West Sixth Street, Suite 2010
Austin, Texas 78701-3901
Telephone:    (737) 667-6100

 Hayden Little (*pro hac vice*)
  haydenlittle@quinnemanuel.com
700 Louisiana Street, Suite 3900
Houston, Texas 77002-2841
Telephone:    (713) 221-7000

*Attorneys for Plaintiffs Yangtze Memory
Technologies Company, Ltd. and Yangtze Memory
Technologies, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD. and YANGTZE MEMORY TECHNOLOGIES, INC., | CASE NO. 5:24-cv-3454-BLF |
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| STRAND CONSULT (d/b/a CHINA TECH THREAT), ROSLYN LAYTON, and DCI GROUP AZ, LLC, | |
| Defendants. | |

Plaintiffs Yangtze Memory Technologies Company, Ltd., and Yangtze Memory Technologies, Inc. (collectively, "YMTC" or "Plaintiffs"), bring this lawsuit against Defendants Strand Consult (d/b/a China Tech Threat), Roslyn Layton, and DCI Group AZ, LLC ("DCI") (collectively, "Defendants").  YMTC's Amended Complaint is based on the following allegations, which YMTC makes on personal information as to its own acts and on information and belief as to all others, based on its reasonable investigation.

## NATURE OF THE ACTION

1.      Flash memory chips are the means by which smart phones, TVs, cloud computing centers, and other devices store massive amounts of data, even after the device is turned off.  They are not the processors of that data.  They are the repositories where the data resides.  Without them, the technology age we enjoy would not exist.  In 2023, flash memory product sales in the United States exceeded $75 billion annually.  They are the subject of intense design development and market competition.

2.      Defendants are sophisticated spammers engaged in a sham marketing scheme.  For their own profit, and at the request of one of Plaintiff YMTC's competitors, Defendants are engaged in a sophisticated "astroturfing" campaign—a deceptive marketing scheme—designed to damage YMTC's reputation and business.  This scheme seeks to destroy YMTC's reputation and business by spreading xenophobic lies that YMTC's market-leading flash memory chips are capable of being used to spy on millions of Americans who use the devices in which the chips are embedded, at the behest of the Chinese Communist Party or its People's Liberation Army.

3.      Defendants' statements are false and unlawful.  And Defendants know that.  They know, for example, that their accusations cannot be true because a memory chip is incapable of transmitting its data to another device.  And the fact that Plaintiff was founded in China does not mean that it is a tool of the Communist Party or the Chinese military.  Defendants know that, too.

4.      Defendants' lies about YMTC and its products have inflicted substantial damage by disrupting YMTC's business relationships and harming its reputation and goodwill.  That was Defendants' objective.  This sham marketing scheme must be stopped, and Defendants must compensate YMTC for the harm they have caused.

5.      YMTC is one of the world's leading developers and manufacturers of 3D NAND flash memories.  Although a newcomer, YMTC has developed and patented technologies that enable the production of better flash memories, having more capacity and a lower per-bit cost.  YMTC's innovations have not gone unnoticed.  At the 2018 Flash Memory Summit in Santa Clara, California, YMTC received the award for the Most Innovative Flash Memory Start-up Company, was recognized as one of "the most creative and ambitious startup companies," and was "applauded" for "becoming a market disruptor and champion of the storage industry."  Since then, YMTC has continued to innovate.  At the 2022 Flash Memory Summit, YMTC received the award for Most Innovative Memory Technology for YMTC's Xtacking® 3.0 3D NAND Architecture.

6.      No longer an upstart, YMTC has become a key player in the global 3D NAND market.  In November 2023, TechInsights, which analyzes and tracks the flash memory market, described YMTC's accomplishments as "nothing short of amazing"—YMTC "is now the leader in 3D NAND flash," having "leap-frogged Micron," another major player in the 3D NAND space.  *YMTC's Xtacking 3.0, first to 200+ layers*, TechInsights, *available at* https://techinsights.com/disruptive-event/ymtc-232l-tlc-3d-nand.  Micron is threatened by YMTC's ascension.

7.      Rather than compete fairly in the marketplace, Micron resorted to a sham marketing scheme to undermine YMTC's achievements by spreading lies about YMTC and its products.  As Bloomberg reported in an article titled *Dell, Micron Backed a Group Raising Alarms on Rivals' China Ties*, Micron funded a website called "China Tech Threat" or "CTT," run by Defendants Roslyn Layton, Strand Consult, and DCI.  *See* **Exhibit 1** (Brody Ford, *Dell, Micron Backed a Group Raising Alarms on Rivals' China Ties*, Bloomberg Businessweek (Jan. 25, 2024), *available at* https://bloomberg.com/news/articles/2024-01-25/dell-micron-backed-a-group-criticizing-chinese-rivals).

8.      Although China Tech Threat purports to be focused on policy, according to Bloomberg, China Tech Threat is engaged in "astroturfing," the practice of cleverly disguising the corporate messaging of businesses (such as Micron), as grassroots advocacy.  *See* Ex. 1.  Indeed, Strand Consult's corporate records show that its business is, in reality, public relations, market

1    research, and management consulting—not public policy.  And its annual reports state that its

2    "purpose is to operate trade and industry, including consultancy."

3        9.    In an interview about this lawsuit, John Strand, founder and CEO of Defendant

4    Strand Consult, admitted that "[o]n the content on China Tech Threat, we have made money."

5    **Exhibit 2** at 3 (Byron Tau, *Are America's Tech Companies Fanning the Flames of Anti-China*

6    *Sentiment?*, NOTUS (July 29, 2024), *available at* https://www.notus.org/technology/america-tech-

7    companies-anti-china-sentiment).[1]  Strand declined to say whether Defendant DCI paid him,

8    Defendant Layton, or Defendant Strand Consult.  *See id.*  On information and belief, DCI pays

9    China Tech Threat on behalf of Micron for China Tech Threat to disseminate favorable messages

10    about Micron's products and disparaging messages about YMTC's competing products.

11        10.    China Tech Threat's disinformation campaign extended beyond YMTC.  As

12    Bloomberg reported, China Tech Threat also targeted Lenovo, another Chinese technology

13    company, at the behest of Dell, falsely claiming that Lenovo's sponsorship of a video game

14    tournament at a U.S. Navy base constituted "infiltration" of military facilities.  *See* Ex. 1 at 5.

15    This demonstrates China Tech Threat's willingness to disseminate false and misleading

16    information to advance the interests of its corporate sponsors.

17        11.    China Tech Threat began its disinformation campaign against YMTC as early as

18    September 2020, publishing outlandish and demonstrably false statements.  For example, China

19    Tech Threat falsely claimed that YMTC was linked to "criminal activity, including a Social

20    Security spoofing scam, identity theft and cyber extortion."  **Exhibit 3** (*As YMTC Booms, China*

21    *Aims to Dominate Flash Memory Industry*, China Tech Threat (Jan. 4, 2021), *available at*

22    https://chinatechthreat.com/as-ymtc-booms-china-aims-to-dominate-flash-memory-industry).

23    There is no basis to support that fiction; China Tech Threat made it up with no citation.  *See id.*

24    China Tech Threat's website also includes a page titled "China's Army to Infiltrate iPhones with

25    YMTC Chips" dedicated to spreading falsehoods inuring to Micron's commercial benefit.

26

27

28    _____
     [1]  Citations are to page numbers generated by ECF.

12.     On June 8, 2022, China Tech Threat published a report titled *Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker YMTC Threatens National Security*. **Exhibit 4** (CTT Report).  The report repeatedly implores "Apple [to] voluntarily end its partnership with YMTC" and "source its chips from existing suppliers like Micron[.]"  *Id.* at 4.  It warns that "the Apple-YMTC deal will likely hasten the exit of an existing memory chip maker from a democratic country" and "could put at least one major non-Chinese semiconductor producer out of business"—highlighting that "[t]he only American company" leading the memory market is "the Idaho-based Micron, which makes both DRAM and NAND chips."  *Id.* at 5-6, 8.

13.     The CTT Report also uniquely airs Micron's grievances against its competitors.  For example, the Report accuses a Chinese chipmaker of "hir[ing] away Micron engineers and encourag[ing] them to steal Micron trade secrets."  Ex. 4 at 7.  The Report does not discuss allegations of theft of any other chipmaker's intellectual property.  This further demonstrates the report's true purpose as a tool for advancing Micron's commercial agenda.

14.     The CTT Report's central claim—that "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing" and "exfiltrate data," compromising "iPhone users' security and privacy"—is demonstrably false.  Ex. 4 at 4, 10-11.  YMTC's memory devices store bits of data (0s and 1s); they cannot execute code to "funnel" or "exfiltrate" data.  YMTC's memory devices store "bits," zeroes and ones.  Memory devices— YMTC's or others—cannot execute code to "funnel" or "exfiltrate" data to Beijing or anywhere else.  Memory chips lack the most basic components necessary for remote control and wireless communications—e.g., antennas, modems, RF processors, and more.  And YMTC would have absolutely no ability to manufacture a chip in such a way as to clandestinely utilize those parts of a mobile device without the device manufacturer knowing.

15.     And Defendants know this.  Defendants claim to have decades of experience in the technology and telecommunications sectors.  With this collective experience, Defendants know, or should know, that their statements about YMTC's products are false.  Their expertise renders their dissemination of false information even more egregious.

16.    China Tech Threat's reports and statements directly benefited Micron, both commercially and reputationally.  Micron faced pricing pressure and the need to improve manufacturing efficiency due to YMTC's emergence as a competitor.  With a limited number of major chip manufacturers globally, a failed deal for YMTC materially increased Micron's likelihood of securing those deals, a dynamic that played out in the market.

17.    Micron's objective was clear: eliminate YMTC as a competitor.  China Tech Threat's false and misleading statements were part of an ongoing scheme orchestrated by Defendants and Micron, and potentially others, to damage YMTC and protect Micron's market share.  As Bloomberg reports, "[w]hile CTT presents as a standalone organization, it is actually a project of DCI Group, a public affairs and consulting firm with a history of 'astroturfing,' the technique of disguising corporate messaging as grassroots advocacy, according to people familiar with the matter and documents viewed by *Bloomberg Businessweek*."  Ex. 1 at 2-3.  On information and belief, Micron is a client of DCI.  *See id.*

18.    The falsehoods Defendants have spread through China Tech Threat have harmed YMTC's reputation and business relationships.  They have also hurt U.S. consumers.  3D NAND flash memory is vital technology for many of the digital products that consumers have come to depend upon and enjoy, such as smartphones, laptops, and tablet computers, as well as for the data centers and enterprise storage solutions in which 3D NAND is used.  Competition and innovation in the NAND memory space benefit consumers, as competition and innovation lead to better products at better prices.  Attempts to stifle competition and hinder innovation do neither.

19.    YMTC respectfully asks this Court to put a stop to Defendants' illegal campaign and conspiracy of spreading misinformation about YMTC and YMTC's products through China Tech Threat and elsewhere and compensate YMTC for the harm caused by Defendants' lies.

## **THE PARTIES**

20.    Plaintiff Yangtze Memory Technologies Company, Ltd. ("YMTC Ltd."), is a prominent developer and manufacturer of advanced memory chips, including 3D NAND flash memory.  YMTC Ltd. is headquartered in Wuhan, China, and conducts business globally.

21.     Plaintiff Yangtze Memory Technologies, Inc. ("YMT Inc."), is a wholly owned subsidiary of Plaintiff YMTC Ltd.  YMT Inc. is a California corporation with its principal place of business in this judicial district, at 2953 Bunker Hill Lane, Ste. 206, Santa Clara, California 95054.

22.     Defendant Strand Consult, also known as "Dialog Management," maintains its principal place of business in Copenhagen, Denmark, and does business as China Tech Threat.  Strand Consult, d/b/a China Tech Threat, operates the website "chinatechthreat.com" and engages in public relations, with a focus on the telecommunications industry.  Strand Consult, d/b/a China Tech Threat, disseminates information and commentary targeting technology policy and markets, including those in the United States and specifically within California.

23.     Defendant Roslyn Layton is Executive Vice President of Strand Consult and a "co-founder" of China Tech Threat.  Layton resides and maintains a domicile at 957 8th Street S., Naples, Florida, an address she has listed on China Tech Threat correspondence.  Layton is registered to vote in Florida and regularly engages in business activities and communications related to China Tech Threat within the United States, including California.  Layton is a citizen of Florida.

24.     Defendant DCI Group AZ, L.L.C. ("DCI"), is an Arizona limited liability company with its principal place of business in Washington, D.C.  DCI is a public affairs firm that is known for "astroturfing" campaigns—a practice of disguising paid corporate advertising and promotion as independent third-party endorsements to gain competitive advantage in the marketplace.  These stealth campaigns manipulate public opinion and government policy by masking the true commercial motives behind the messaging.  Each member of DCI is a citizen of a state other than California.  *See* **Exhibit 5** (Arizona Corporations Commission records listing membership addresses in Arizona, Nebraska, New Hampshire, and Maryland).

## JURISDICTION AND VENUE

25.     This Court has personal jurisdiction over all Defendants.  Each Defendant intentionally directed false and misleading statements through the China Tech Threat website at YMT Inc. and California, knowing YMT Inc. maintained its principal place of business in this

district.  This conduct forms the basis of YMTC's claims and constitutes purposeful availment of California.

26.     Defendants disseminated these false statements through the China Tech Threat website, which is accessible in California, and tailored its content to influence the U.S. semiconductor market.  The China Tech Threat website targets California through its content and technical infrastructure.  The China Tech Threat webpage uses Cloudflare content delivery network (CDN) services to improve the speed at which the site can be accessed within California.  Cloudflare is headquartered in and provides its services from California.  China Tech Threat webpage collects information about visitors, via "cookies," including those in California.

27.     Defendants operated the China Tech Threat website specifically to influence California business decisions and harm YMTC's California operations.  For example, the CTT Report "Silicon Sellout," authored by Defendants and available for download on the CTT website, explicitly targeted Apple Inc. in Cupertino, California, urging Apple to terminate its relationship with YMTC and instead partner with YMTC's competitor.

28.     YMTC's sales, field engineering, and quality teams, including its Director of Sales, routinely travelled throughout this judicial district to meet and work with potential customers and technical partners headquartered or located in the Northern District of California.  YMT Inc., operating within this judicial district, engaged in business discussions with prospective customers in Northern California during 2022.  Defendants' false statements, knowingly timed and published on the China Tech Threat website to disrupt these discussions, directly and foreseeably harmed YMT Inc.'s business relationships.  Following Defendants' Summer 2022 statements, YMTC's relationships with customers and potential customers in this district terminated.

29.     Each Defendant's activities demonstrate purposeful direction at California, including because, at minimum: (a) Defendants published or agreed to publish false, misleading, and defamatory statements that were expressly aimed at California and California persons; (b) Defendants directed their intentionally injurious acts towards a company and its wholly owned California subsidiary, and to cause harm to that California subsidiary; (c) the brunt of the harm suffered by Plaintiffs and caused by Defendants' conduct occurred in California, for example,

1  through the loss of customers, potential customers, and technical partners headquartered or located

2  in the Northern District of California; (d) Defendants regularly traveled to and within the United

3  States for business, and (e) Defendants used California-based internet infrastructure to disseminate

4  their false and misleading statements.

5       30.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331,

6  as the claims asserted arise under the Lanham Act, 15 U.S.C. § 1125(a), and involve questions of

7  federal law.  Specifically, this case involves allegations of false and misleading advertising, unfair

8  competition, and commercial disparagement, all of which fall squarely within the scope of the

9  Lanham Act and create a federal question.  The amount in controversy exceeds $75,000, exclusive

10 of interest and costs.

11      31.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because: (a) the

12 targeted online publications and their detrimental impact on YMTC's business relationships

13 caused substantial events and harm to occur within this district; (b) YMT Inc.'s principal place of

14 business is located within this district; (c) Defendants intentionally directed their actions at YMT

15 Inc. within this district; and (d) this Court has personal jurisdiction over all Defendants.

**DIVISIONAL ASSIGNMENT**

17      32.      This action is properly assigned to the San Jose division pursuant to Civil Local

18 Rule 3-2(c).  YMT Inc., the California plaintiff, maintains its principal place of business in Santa

19 Clara County.  Moreover, a substantial part of the events and omissions giving rise to YMTC's

20 claims, including the direction of Defendants' harmful online conduct, the impact on YMTC's

21 business relationships, and the resulting commercial harm, occurred within Santa Clara County.

**ALLEGATIONS COMMON TO ALL CLAIMS**

***YMTC Is Recognized As One Of The Most Innovative 3D NAND Memory Companies***

24      33.      YMTC is an integrated device manufacturer that specializes in developing memory

25 products for the global market.  YMTC has over 7,400 employees, including 5,600 engineers,

26 1,700 research and development personnel, and over 300 employees with PhDs.

27      34.      YMTC's focus on 3D NAND flash memory design has yielded significant

28 innovations, earning the company widespread industry acclaim.  YMTC has successfully designed

1    and manufactured 3D NAND flash memory chips with exceptional bit densities, input/output

2    speeds, and storage capacities.  These achievements have garnered significant praise from industry

3    experts.  YMTC maintains its ties to Silicon Valley through its wholly owned subsidiary, YMT

4    Inc., which is incorporated and located in this judicial district.

5        35.    YMTC's leadership in 3D NAND flash memory technology has been recognized

6    by the Flash Memory Summit, the industry's premier conference held annually in Santa Clara,

7    California.  *See, e.g.*, *Flash Memory Summit Announces 2018 Best of Show Award Winners*,

8    Associated Press (Aug. 9, 2018), *available at* https://apnews.com/press-release/globe-newswire/

9    technology-business-472edca95b4b227a486f5f8c4750cbb3.  This event, which attracts up to

10    6,000 attendees and over 100 global sponsors, is regarded as the largest and most influential

11    gathering of flash memory experts worldwide.

12        36.    In 2018, the Summit honored YMTC with the "Best of Show" award for "Most

13    Innovative Flash Memory Start-up Company," recognizing YMTC as one of "the most creative

14    and ambitious startup companies" and applauding its potential to become "a market disruptor and

15    champion of the storage industry."  This recognition continued in 2022, when the Summit

16    awarded YMTC's Xtacking® 3.0 3D NAND Architecture the "Most Innovative Memory

17    Technology" award.  Independent industry analysis further validates YMTC's technological

18    leadership.  TechInsights, a leading firm specializing in semiconductor analysis, has identified

19    YMTC's innovation as resulting in "the world's most advanced 3D NAND memory chip in a

20    consumer device," achieving "the highest bit density seen in a commercially available NAND

21    product."  *China Does It Again: A NAND Memory Market First*, TechInsights, *available at*

22    https://www.techinsights.com/blog/china-does-it-again-nand-memory-market-first.

23        37.    In 2022, as a direct result of its innovative 3D NAND flash memory chip designs,

24    YMTC was selected to supply its advanced memory chips to a leading global designer and

25    manufacturer of consumer computing products ("YMTC OEM Customer #1"), which is both

26    located and headquartered within this judicial district.  Defendants were fully aware of this

27    significant business relationship, including the customer's location and headquarters in California,

28    the presence of YMTC sales personnel in California, and the negotiation of the agreement in

1    California.  Further, for years through 2022, YMTC engaged in active discussions with other

2    prospective customers and technical partners located in the Northern District of California

3    ("Prospective YMTC OEMs").  These ongoing discussions underscore YMTC's substantial and

4    continuous business activities within this judicial district.

5            ***Micron, Threatened by YMTC's Rise, Orchestrates a False Advertising Campaign***

6            38.    Micron Technology, Inc., is a global manufacturer and supplier of memory

7    products for consumer and enterprise products, systems, and services, including 3D NAND.

8    Although Micron started developing 3D NAND before YMTC was founded in 2016, by 2022,

9    industry publications recognized that YMTC was by then "the leader in 3D NAND flash," having

10   "leap-frogged Micron."  *YMTC's Xtacking 3.0, First to 200+ Layers*, TechInsights (Nov. 11,

11   2022), https://www.techinsights.com/disruptive-event/ymtc-232l-tlc-3d-nand.  Industry insiders

12   predicted that "YMTC would be the uncontested Flash technology leader before 2030,"

13   concluding that "[w]hat YMTC has accomplished has been nothing short of amazing."  *See id.*

14           39.    Micron, facing a direct challenge to its market share and profitability from

15   YMTC's rapid ascent, resorted to a deceptive disinformation campaign rather than fair

16   competition.  Instead of innovating and competing on the merits of its products, Micron sought to

17   undermine YMTC's competitive standing through false and misleading promotional and

18   advertising statements.  As reported by Bloomberg, Micron funded China Tech Threat—jointly

19   run by Defendants—to engage in advocacy "align[ed] with [its] corporate interests."  *See* Ex. 1

20   at 2.  Although China Tech Threat presented itself as an "standalone organization," Bloomberg

21   revealed its true nature as an "astroturfing" operation, a practice that disguises corporate

22   promotion as grassroots advocacy to manipulate public opinion and deceive consumers.  *See id.*

23   at 2.

24           40.    Micron, in coordination with Defendants and potentially other undisclosed actors,

25   engaged in this ongoing "astroturfing" scheme, utilizing China Tech Threat as a platform to

26   disseminate false and misleading claims about YMTC and its products to the relevant public.  This

27   deceptive campaign, which involved disparaging YMTC to benefit Micron commercially, also

28

1   promoted Micron as a U.S. memory manufacturer and urged YMTC's customers, including those

2   in this judicial district, to favor Micron's products over YMTC's.  Ex. 4 at 4, 8, 14.

3        41.    YMTC uncovered a coordinated and concealed effort by Defendants to disseminate

4   false and misleading information about YMTC through various channels, including the China

5   Tech Threat website and related promotional materials.  This scheme involved DCI surreptitiously

6   providing content to China Tech Threat on Micron's behalf and under Micron's direction from

7   2020 through 2022, such as a press release falsely alleging YMTC's ties to the Chinese military.

8   *See* **Exhibit 6** at 2.  Though ostensibly authored by Defendant Layton, this press release and other

9   China Tech Threat publications were created by DCI and its employees.  Defendants Strand

10  Consult and Layton actively worked to conceal their connections to DCI and Micron.  This pattern

11  of covert collaboration and concealed authorship demonstrates a deliberate and deceptive

12  campaign to spread false information about YMTC.

13       42.    The non-partisan journalism website NOTUS corroborated these findings, reporting

14  that "DCI Group employees were included in the metadata of the documents embedded on the

15  [China Tech Threat] website over the past several years."  Ex. 2 at 3.  NOTUS also noted that

16  some documents listing DCI employees as the author "have since been taken down [from the

17  China Tech Threat website] and replaced with new documents without metadata, but the older

18  versions have been captured by the Internet Archive's Wayback Machine."  *Id.*

19       43.    The promotional materials that Defendant DCI authored include statements that

20  mirror the false and misleading statements in the CTT Report.  For example, the report titled

21  *Secure Equipment: The Whole of Government Effort to Restrict Dangerous Devices*, contains,

22  without any supporting citation, that "YMTC chips can be enabled with kill switches which can

23  cause a device and/or network shutdown."  *See* **Exhibit 7** at 5.  It further claims that

24  vulnerabilities in these chips "could be exploited months or years later to disrupt or exfiltrate data

25  from a system containing the compromised chip."  *See id.*  These unsubstantiated assertions mirror

26  the CTT Report's false allegations of spyware and data exfiltration to Beijing.  *See* Ex. 4 at 11.

27  The latter statement is reprinted in the CTT Report **verbatim**.

28

44.     On its face, the *Secure Equipment* report attributes authorship to China Tech Threat and provides no indication of Defendant DCI's involvement.  Nowhere in the visible text of the document is there any mention of DCI or its employees.  Only through forensic analysis of the document's metadata was YMTC able to uncover that DCI employee Emily Sullivan was its true author, as shown in the screenshot below:



45.     DCI actively concealed its role in creating and disseminating the false statements about YMTC.  Despite reasonable diligence, YMTC did not have any reason to suspect DCI's involvement until Bloomberg published its report in January 2024, revealing for the first time that China Tech Threat was not a standalone organization but rather engaged in "astroturfing."  This fact was confirmed when the non-partisan journalism website NOTUS published its investigation in July 2024, uncovering that "at least five DCI Group employees were included in the metadata of the documents embedded on the [China Tech Threat] website over the past several years."

46.     DCI's concealment included: (a) operating behind China Tech Threat's facade while deliberately avoiding any public connection to the website or its content, (b) allowing China

Tech Threat to present itself as an independent organization while secretly authoring its content, (c) attempting to destroy evidence of its involvement by removing metadata from documents on China Tech Threat's website after the Bloomberg and NOTUS articles exposed DCI's role, and (d) taking extraordinary measures to scrub documents containing metadata that would have revealed DCI's role in creating the false and misleading content.

47.    On information and belief, Defendants actively concealed Micron's funding and control of the China Tech Threat campaign.  Defendants' CTT Report and other publications did not disclose Micron's involvement or DCI's role in creating the content.  Defendants' intended this concealment to create the false impression of independent research and objective reporting.

48.    Only through the independent investigative reporting by Bloomberg and NOTUS, followed by YMTC's forensic analysis of archived web content and metadata, was YMTC able to uncover the full extent of DCI's involvement in creating and disseminating the false statements.

49.    Defendants' scheme to create a "front" website surreptitiously backed by a YMTC competitor is an established DCI tactic.  The firm notoriously operated a seemingly independent website called Tech Central Station that voiced policy opinions.  In reality, DCI operated the website to promote its corporate clients' goods, services, and commercial activities.  *See* Nick Confessore, *How James Glassman reinvented journalism—as lobbying*, Wash. Monthly (Dec. 2, 2003), *available at* https://washingtonmonthly.com/2003/12/02/meet-the-press.

50.    In an earlier report, *Bloomberg Businessweek* reported that a DCI unit maintains ties "with dozens of nonprofits and advocacy groups, regularly contributing money and then requesting their assistance on projects."  Zachary Mider & Ben Elgin, *How Hedge Funds (Secretly) Get Their Way in Washington*, Bloomberg Businessweek (Jan. 25, 2018), *available at* https://www.bloomberg.com/news/features/2018-01-25/how-hedge-funds-secretly-get-their-way-in-washington.  One former DCI employee has stated that "staffers, policy experts, and even journalists were fed lines" by DCI.  *Id.*

1    *Defendants Spread Lies About YMTC And Its Products, Inuring To Micron's Benefit*

2    51.    Since at least April 2022, Defendants have featured a special section on the China

3    Tech Threat website titled *China's Army to Infiltrate iPhones with YMTC Chips*, *available at*

4    https://chinatechthreat.com/chinas-army-to-infiltrate-iphones-with-ymtc-chips.  This section

5    includes a misleading graphic falsely equating the presence of a YMTC memory chip in a mobile

6    device with Chinese military infiltration:



18    52.    On June 8, 2022, Defendants published a report on that section of the China Tech

19    Threat website titled *Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker*

20    *YMTC Threatens National Security* (the "CTT Report").  Ex. 4.  Each Defendant authored and

21    participated in publishing the CTT Report, directly controlling and monitoring the content, and

22    knowingly allowing its publication.

23    53.    The CTT Report contains demonstrably false and misleading statements.  For

24    example, it falsely states that "YMTC chips equipped with spyware and installed on Apple devices

25    could funnel collected data back to Beijing."  Ex. 4 at 11.  It also falsely states that "built-in and

26    concealed vulnerabilities" in YMTC chips could be "exploited months or years later to disrupt

27    performance or exfiltrate data from a system containing the compromised chip."  *Id.* at 10.

28    Further, under the heading "Risk #1: National Security – The Battlefield Control Switch," the

1   CTT Report misleadingly claims that YMTC chips could have a "kill switch" that "could be

2   enabled or programmed to shut down remotely by an unauthorized Chinese government actor."

3   *Id.*  And it even deceptively claims that these purported vulnerabilities "would not be detected

4   during manufacturing."  *Id.*  Remarkably, the only "support" that the report cites for this lie is a

5   **work of fiction** titled "Ghost Fleet: A Novel of the Next World War."  *Id.*

6        54.    These statements are false and misleading.  YMTC designs and manufactures

7   memory chips—arrays storing data (0s and 1s).  Memory chips, including YMTC's, lack the

8   components for wireless transmission or remote control (antennas, modems, RF processors).

9   YMTC's NAND chips cannot execute code; they simply store data.  However, the ordinary reader

10  in the relevance audience, as well as YMTC's customers and potential customers, would

11  understand these statements to mean that YMTC's memory chips are subject to remote control

12  from China, capable of spying on American consumers, and designed to transmit user information

13  to China.  *See* Ex. 4 at 9, 10.  These statements disparage YMTC and its products, creating a false

14  impression of national security risks and Chinese surveillance of the American public.  *Id.* at 4.

15       55.    Defendants know these claims are false.  Defendant Strand Consult presents itself

16  as a leading telecommunications technology authority with 25 years of experience.  Defendant

17  Layton claims expertise in "telecom network innovation" and "network security."  And Defendant

18  DCI has worked extensively with technology and telecommunications companies, including

19  Micron, understanding that memory chips store data, not execute spyware.  The false claims in the

20  CTT Report demonstrate, at minimum, a reckless disregard for the truth.

21       56.    Defendants widely disseminated the CTT Report, which, alongside its false claims

22  about YMTC, promotes Micron.  The CTT Report highlights "Idaho-based Micron" as the "only

23  American company" leading memory manufacturing and repeatedly urges Apple to source chips

24  from "non-Chinese chipmakers like Micron" (Ex. 4 at 4, 8, 14), advancing Micron's unlawful plan

25  to stifle competition and undermine YMTC's credibility.  Micron, YMTC's direct competitor,

26  benefits most from YMTC's lost customers and sales in the United States.

27

28

***YMTC Has Suffered Significant Harm From Defendants' Unlawful Conduct***

57.    Although it is not inherently unlawful to advocate for a corporation's position, Defendants' actions crossed the line into illegality by disseminating false, deceptive, and misleading statements about YMTC and its products to advertise and promote Micron's commercial interests.  Defendants have acted with malicious intent to cause harm to YMTC and further the interests of its corporate backers, including Micron.

58.    Defendants' false statements about YMTC were intended to discourage customers and potential purchasers from conducting business with YMTC, not merely to encourage government action.  The CTT Report explicitly urged companies to sever ties with YMTC and "source memory chips non-Chinese chipmakers like Micron," among others.  Ex. 4 at 14.  This demonstrates the anti-competitive nature of the CTT Report, which had its intended effect before any government action.

59.    After Defendants published the false and misleading CTT Report, YMTC lost business opportunities with prospective customers and technical partners.  Defendants' false statements disrupted pending transactions, costing YMTC hundreds of millions of dollars in potential sales of 3D NAND flash memory products to leading computer and consumer electronics manufacturers, including companies in this judicial district.

60.    Defendants' astroturfing campaign achieved its intended goal of disrupting YMTC's business relationships, particularly in the United States and California.  Defendants' false statements damaged the reputation and goodwill of YMTC, its U.S. subsidiary, and its memory products, harming relationships with customers, prospective customers, and technical partners.  Ex. 4 at 4, 14.

## FIRST CLAIM FOR RELIEF

### False Advertising, Product Disparagement, and Unfair Competition

### Under the Lanham Act, 15 U.S.C. § 1125(a)

### (Directly Against All Defendants)

61.    YMTC repeats and realleges paragraphs 1 through 60 above as if set forth herein.

62.     Defendants engaged in a widespread and coordinated campaign of false and misleading commercial advertising and promotion specifically targeting YMTC and its 3D NAND flash memory products.  This campaign involved the dissemination of false and misleading statements through various channels and mediums, including the China Tech Threat website, articles published on China Tech Threat and elsewhere, press releases distributed to media outlets and industry publications, social media posts on platforms such as Twitter and LinkedIn, presentations at industry conferences and events, and direct communications with YMTC's existing and prospective customers.

63.     This "astroturfing" disinformation campaign, orchestrated for the benefit of Micron, YMTC's direct competitor in the 3D NAND flash memory market, was designed to undermine YMTC's competitive standing and divert sales to Micron.  Defendants' unlawful conduct was: (a) commercial in nature, promoting Micron's competing 3D NAND flash memory products while disparaging YMTC's; (b) intentionally designed to influence purchasing decisions of OEMs, businesses incorporating memory chips, and ultimate consumers by diverting sales from YMTC to Micron; and (c) disseminated broadly to the relevant purchasing public through the above-mentioned channels, ensuring wide exposure to the false and misleading claims.

64.     As part of this campaign, Defendants made demonstrably false and misleading statements of fact in their commercial advertising and promotion.  These statements were intended to exploit xenophobic anxieties and prejudice against YMTC to benefit Micron, a U.S.-based company.  These statements, some of which were literally false and others misleading though literally true, included, among others:

(a)     The false and/or misleading statement: "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion," published by Defendants on January 4, 2021, on the China Tech Threat website.  Ex. 3.

(b)     The false and/or misleading statement: "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(c)     The false and/or misleading statement: "YMTC chips… present the possibility that malicious technology… from the Chinese military could be introduced to Apple end-users," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(d)     The false and/or misleading statement: "YMTC chips could be… intentionally compromised with rogue features… These built-in and concealed vulnerabilities would not be detected during manufacturing.  They could be exploited … to disrupt performance or exfiltrate data," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.

(e)     The false and/or misleading statement: "Electronics with embedded chips are enabled with a 'kill switch'… Such features, under Chinese military production, could be enabled… to shut down remotely by an unauthorized Chinese government actor," published by Defendants on June 8, 2022, in the CTT Report.  Ex. 4.  Defendants' statement misleadingly suggested that YMTC's memory chips could execute code and activate a "kill switch" in devices. This is false because YMTC's memory chips, unlike microprocessors, do not execute code. Defendants further fueled this misconception by citing an article about cyberattacks on military hardware involving microprocessors, using the term "chip" to imply that YMTC's products could similarly be compromised.

65.     These and other false and misleading statements, disseminated through the channels described above, falsely portrayed YMTC and its products as: (a) posing national security risks; (b) containing spyware and "kill switches"; (c) being vulnerable to manipulation by the Chinese government; and (d) being associated with criminal activity.  These representations were either literally false or, though literally true, misleading due to omissions and implications.

66.     Defendants knew, or recklessly disregarded, the falsity or misleading nature of these statements.  They further compounded the deception by concealing Micron's funding and direction of the disinformation campaign, creating a false impression of objectivity and independent analysis, when in reality, the China Tech Threat publications and statements constituted coordinated and paid-for commercial advertising and promotion for Micron.

67.     These statements deceived, or had the tendency to deceive, a substantial segment of the relevant purchasing public, or those making purchasing decisions, including YMTC's

customers and prospective customers, OEMs, businesses, and consumer end-users, who rely on accurate information about technology products when making purchasing decisions. Defendants knew, or reasonably should have known, that their statements were false or misleading and intended to deceive these audiences into believing that YMTC and its products posed a security risk, were inferior in quality to Micron's products, or were otherwise undesirable.

68. The deceptive statements were material and likely to influence purchasing decisions. Consumers and businesses, particularly in the technology sector, are sensitive to national security concerns and the potential for data breaches and cyberattacks. The false and misleading claims of spyware, Chinese government control, and criminal activity that Defendants disseminated were designed to exploit these sensitivities and cause deception among the relevant purchasing public. This deception directly influenced the purchasing decisions of these audiences, causing them to refrain from purchasing products with YMTC chips and from doing business with YMTC, thereby directly and foreseeably harming YMTC's sales, revenue, and market share.

69. As a direct and proximate result of Defendants' false and misleading advertising and promotion, YMTC suffered substantial injury, including harm to YMTC's reputation and goodwill, resulting in lost sales, revenue, opportunities, and market share, as well as expenses incurred to mitigate the harm caused by Defendants' false statements. Defendants' false statements also directly harmed YMTC's reputation and goodwill within the industry and among consumers, making it more difficult for YMTC to compete effectively in the market, attract and retain customers, secure investments, and recruit and retain employees. Defendants' conduct was a substantial factor in causing these harms to YMTC. Micron, as YMTC's direct competitor in the relevant market, directly and proximately benefited from this harm by capturing market share, sales, and/or revenue that otherwise would have gone to YMTC.

70. Defendants' conduct constitutes false advertising, product disparagement, and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

71. YMTC is entitled to recover from Defendants all damages proximately caused by Defendants' unlawful conduct in an amount to be determined at trial, including for actual damages, lost profits, damages to reputation and goodwill, corrective advertising costs, and

1    disgorgement of Defendants' profits attributable to false advertising.  YMTC also seeks

2    prejudgment interest, costs, and attorneys' fees in accordance with governing law, especially given

3    the exceptional nature of Defendants' unlawful conduct.

4        72.    YMTC also has no adequate remedy at law and therefore seeks injunctive relief to

5    prevent Defendants from repeating or republishing these false and misleading statements, as well

6    as corrective advertising to mitigate the harm caused by Defendants' unlawful conduct.

7                          **SECOND CLAIM FOR RELIEF**

8            **False Advertising, Product Disparagement, and Unfair Competition**

9                    **Under the Lanham Act, 15 U.S.C. § 1125(a)**

10                        **(Contributorily Against DCI)**

11        73.    YMTC repeats and realleges paragraphs 1 through 60 above as if set forth herein.

12        74.    As described above, DCI intended to participate in and knew about the false,

13    misleading, and disparaging statements about YMTC made on China Tech Threat.  As Bloomberg

14    reported, China Tech Threat is a "project" of DCI.  Ex. 1 at 4.  On information and belief, DCI

15    funded China Tech Threat and authored false, misleading, and disparaging statements about

16    YMTC.  DCI actively and materially furthered the unlawful conduct by inducing it, causing it, and

17    working to bring it about.  DCI also controlled and monitored the content on China Tech Threat,

18    including the false, misleading, and disparaging statements about YMTC.  As described above,

19    multiple documents on China Tech Threat's website list DCI or its employees as the true authors.

20        75.    Defendants engaged in a widespread and coordinated campaign of false and

21    misleading commercial advertising and promotion specifically targeting YMTC and its 3D NAND

22    flash memory products.  This campaign involved the dissemination of false and misleading

23    statements through various channels and mediums, including the China Tech Threat website,

24    articles published on China Tech Threat and elsewhere, press releases distributed to media outlets

25    and industry publications, social media posts on platforms such as Twitter and LinkedIn,

26    presentations at industry conferences and events, and direct communications with YMTC's

27    existing and prospective customers.

28

76. This "astroturfing" disinformation campaign, orchestrated for the benefit of Micron, YMTC's direct competitor in the 3D NAND flash memory market, was designed to undermine YMTC's competitive standing and divert sales to Micron. Defendants' unlawful conduct was: (a) commercial in nature, promoting Micron's competing 3D NAND flash memory products while disparaging YMTC's; (b) intentionally designed to influence purchasing decisions of OEMs, businesses incorporating memory chips, and ultimate consumers by diverting sales from YMTC to Micron; and (c) disseminated broadly to the relevant purchasing public through the above-mentioned channels, ensuring wide exposure to the false and misleading claims.

77. As part of this campaign, Defendants made demonstrably false and misleading statements of fact in their commercial advertising and promotion. These statements were intended to exploit xenophobic anxieties and prejudice against YMTC to benefit Micron, a U.S.-based company. These statements, some of which were literally false and others misleading though literally true, included, among others:

(a) The false and/or misleading statement: "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion," published by Defendants on January 4, 2021, on the China Tech Threat website. Ex. 3.

(b) The false and/or misleading statement: "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing," published by Defendants on June 8, 2022, in the CTT Report. Ex. 4.

(c) The false and/or misleading statement: "YMTC chips… present the possibility that malicious technology… from the Chinese military could be introduced to Apple end-users," published by Defendants on June 8, 2022, in the CTT Report. Ex. 4.

(d) The false and/or statement: "YMTC chips could be… intentionally compromised with rogue features… These built-in and concealed vulnerabilities would not be detected during manufacturing. They could be exploited … to disrupt performance or exfiltrate data," published by Defendants on June 8, 2022, in the CTT Report. Ex. 4.

(e) The false and/or misleading statement: "Electronics with embedded chips are enabled with a 'kill switch'… Such features, under Chinese military production, could be

enabled… to shut down remotely by an unauthorized Chinese government actor," published by Defendants on June 8, 2022, in the CTT Report. Ex. 4. Defendants' statement misleadingly suggested that YMTC's memory chips could execute code and activate a "kill switch" in devices. This is false because YMTC's memory chips, unlike microprocessors, do not execute code. Defendants further fueled this misconception by citing an article about cyberattacks on military hardware involving microprocessors, using the term "chip" to imply that YMTC's products could similarly be compromised.

78.     These and other false and misleading statements, disseminated through the channels described above, falsely portrayed YMTC and its products as: (a) posing national security risks; (b) containing spyware and "kill switches"; (c) being vulnerable to manipulation by the Chinese government; and (d) being associated with criminal activity. These representations were either literally false or, though literally true, misleading due to omissions and implications.

79.     Defendants knew, or recklessly disregarded, the falsity or misleading nature of these statements. They further compounded the deception by concealing Micron's funding and direction of the disinformation campaign, creating a false impression of objectivity and independent analysis, when in reality, the China Tech Threat publications and statements constituted coordinated and paid-for commercial advertising and promotion for Micron.

80.     These statements deceived, or had the tendency to deceive, a substantial segment of the relevant purchasing public, or those making purchasing decisions, including YMTC's customers and prospective customers, OEMs, businesses, and consumer end-users, who rely on accurate information about technology products when making purchasing decisions. Defendants knew, or reasonably should have known, that their statements were false or misleading and intended to deceive these audiences into believing that YMTC and its products posed a security risk, were inferior in quality to Micron's products, or were otherwise undesirable.

81.     The deceptive statements were material and likely to influence purchasing decisions. Consumers and businesses, particularly in the technology sector, are sensitive to national security concerns and the potential for data breaches and cyberattacks. The false and misleading claims of spyware, Chinese government control, and criminal activity that Defendants

disseminated were designed to exploit these sensitivities and cause deception among the relevant purchasing public.  This deception directly influenced the purchasing decisions of these audiences, causing them to refrain from purchasing products with YMTC chips and from doing business with YMTC, thereby directly and foreseeably harming YMTC's sales, revenue, and market share.

82.     As a direct and proximate result of Defendants' false and misleading advertising and promotion, YMTC suffered substantial injury, including harm to YMTC's reputation and goodwill, resulting in lost sales, revenue, opportunities, and market share, as well as expenses incurred to mitigate the harm caused by Defendants' false statements.  Defendants' false statements also directly harmed YMTC's reputation and goodwill within the industry and among consumers, making it more difficult for YMTC to compete effectively in the market, attract and retain customers, secure investments, and recruit and retain employees.  Defendants' conduct was a substantial factor in causing these harms to YMTC.  Micron, as YMTC's direct competitor in the relevant market, directly and proximately benefited from this harm by capturing market share, sales, and/or revenue that otherwise would have gone to YMTC.

83.     Defendants caused the false statements to enter interstate commerce by way of China Tech Threat's website and other platforms in and affecting interstate commerce. Defendants' conduct constitutes false advertising, product disparagement, and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

84.     YMTC is entitled to recover from Defendants all damages proximately caused by Defendants' unlawful conduct in an amount to be determined at trial, including for actual damages, lost profits, damages to reputation and goodwill, corrective advertising costs, and disgorgement of Defendants' profits attributable to false advertising.  YMTC also seeks prejudgment interest, costs, and attorneys' fees in accordance with governing law, especially given the exceptional nature of Defendants' unlawful conduct.

85.     YMTC also has no adequate remedy at law and therefore seeks injunctive relief to prevent Defendants from repeating or republishing these false and misleading statements, as well as corrective advertising to mitigate the harm caused by Defendants' unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, YMTC respectfully requests that the Court render the following relief:

1.     Grant judgment in favor of YMTC and against each Defendant;

2.     Grant all appropriate injunctive relief, including corrective advertising;

3.     Award YMTC an appropriate amount in monetary damages against Defendants as determined at trial, including general, compensatory, special, and treble damages, and including pre-judgment interest, in accordance with applicable law;

4.     Award YMTC disgorgement of Defendants' profits; and

5.     Grant YMTC such other relief as is just and appropriate, including attorneys' fees and costs.

Dated:  November 17, 2024

QUINN EMANUEL URQUHART & SULLIVAN LLP


By   */s/ Robert M. Schwartz*
            Robert M. Schwartz

*Attorneys for Plaintiffs Yangtze Memory Technologies Company, Ltd. and Yangtze Memory Technologies, Inc.,*

1

## <u>DEMAND FOR JURY TRIAL</u>

2

YMTC hereby demands a trial by jury.

3

Dated:  November 17, 2024                          QUINN EMANUEL URQUHART &
                                                                            SULLIVAN LLP

4

5

6                                                                 By   _/s/ Robert M. Schwartz_____
                                                                              Robert M. Schwartz

7

8                                                                 *Attorneys for Plaintiffs Yangtze Memory*
                                                                 *Technologies Company, Ltd. and Yangtze*
                                                                 *Memory Technologies, Inc.,*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28