1    QUINN EMANUEL URQUHART &
     SULLIVAN, LLP
2     David Eiseman (Bar No. 114758)
       davideiseman@quinnemanuel.com
3     50 California Street, 22nd Floor
      San Francisco, California 94111-4788
4     Telephone:    (415) 875-6600

5     Robert Schwartz (Bar No. 117166)
       robertschwartz@quinnemanuel.com
6     Aaron Perahia (Bar No. 304554)
       aaronperahia@quinnemanuel.com
7     865 South Figueroa Street, 10th Floor
      Los Angeles, California 90017-2543
8     Telephone:    (213) 443-3000

9     Evan Pearson (*pro hac vice*)
       evanpearson@quinnemanuel.com
10    300 West Sixth Street, Suite 2010
      Austin, Texas 78701-3901
11    Telephone:    (737) 667-6100

12    Hayden Little (*pro hac vice*)
       haydenlittle@quinnemanuel.com
13    700 Louisiana Street, Suite 3900
      Houston, Texas 77002-2841
14    Telephone:    (713) 221-7000

15    *Attorneys for Plaintiffs Yangtze Memory
      Technologies Company, Ltd. and Yangtze
16    Memory Technologies, Inc.*

17                    **UNITED STATES DISTRICT COURT**

18         **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

19    YANGTZE MEMORY TECHNOLOGIES          Case No. 5:24-cv-03454-BLF
      COMPANY, LTD. and YANGTZE
20    MEMORY TECHNOLOGIES, INC.,            Hon. Beth Labson Freeman

21                    Plaintiffs,           **PLAINTIFFS' OPPOSITION TO
                                            DEFENDANTS' MOTION TO DISMISS
22            vs.                           AMENDED COMPLAINT PURSUANT
                                            TO RULES 12(b)(1), (2), & (6) AND 9(b)**
23    STRAND CONSULT, ROSLYN LAYTON,
      and DCI GROUP AZ LLC,                 [Concurrently filed with Declaration of Aaron
24                                          Perahia]
                      Defendants.
25                                          Date:     March 13, 2025
                                            Time:     9:00 am
26                                          Place:    Courtroom 3, 5th Floor

27                                          Action Filed:    June 7, 2024
                                            Trial Date:      March 22, 2027
28

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................2

ARGUMENT ..................................................................................................................5

I.      THE COURT HAS SUBJECT-MATTER JURISDICTION. ..............................................5

        A.      Subject Matter Jurisdiction is Based on the Amended Complaint ...........................5

        B.      Alternatively, the Court Can and Should Construe Plaintiffs' Amended
                Complaint as a Newly Filed Action ...........................................................8

        C.      Even Under the Original Complaint, Diversity Jurisdiction Existed. ........................9

II.     THIS COURT HAS PERSONAL JURISDICTION OVER DCI. ......................................10

III.    PLAINTIFFS HAVE ARTICLE III STANDING TO ASSERT THEIR CLAIMS. ...........13

IV.     PLAINTIFFS HAVE STANDING UNDER THE LANHAM ACT. ..................................17

V.      PLAINTIFFS HAVE ADEQUATELY ALLEGED LANHAM ACT CLAIMS. ...............20

        A.      Defendants Engaged In Commercial Advertising or Promotion. ..........................20

        B.      Plaintiffs Properly Pleaded That Defendants' Statements Were False. ...................23

VI.     IF NECESSARY, THE COURT SHOULD GRANT LEAVE TO AMEND......................25

CONCLUSION .............................................................................................................25

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Allbirds, Inc. v. Giesswein Walkwaren AG,*
   2020 WL 6826487 (N.D. Cal. June 4, 2020) ................................................................ 16, 25

5

6

*AMA Multimedia, LLC v. Wanat,*
   970 F.3d 1201 (9th Cir. 2020) ............................................................................................ 13

7

8

*Ariix, LLC v. Nutrisearch Corp.,*
   2023 WL 2933306 (S.D. Cal. Apr. 13, 2023) .............................................................. 22, 23

9

*Ariix, LLC v. NutriSearch Corp.,*
   985 F.3d 1107 (9th Cir. 2021) ........................................................... 16, 20, 21, 22, 25

10

11

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.,*
   733 F.3d 939 (9th Cir. 2013) ............................................................................................. 14

12

13

*United States ex rel. Atkins v. Reiten,*
   313 F.2d 673 (9th Cir. 1963) ............................................................................................... 8

14

15

*Augustine v. United States,*
   704 F.2d 1074 (9th Cir. 1983) ............................................................................................. 5

16

*Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.,*
   2008 WL 6742224 (N.D. Cal. Dec. 18, 2008) ............................................................ 23, 25

17

18

*Banuelos-Ayon v. Holder,*
   611 F.3d 1080 (9th Cir. 2010) ............................................................................................. 8

19

*Bolger v. Youngs Drug Prods. Corp.,*
   463 U.S. 60 (1983) .............................................................................................................. 21

20

21

*Calder v. Jones,*
   465 U.S. 783 (1984) ............................................................................................................ 11

22

23

*Chabner v. United of Omaha Life Ins. Co.,*
   225 F.3d 1042 (9th Cir. 2000) ............................................................................................. 6

24

*Cisco Sys., Inc. v. Beccela's Etc.,*
   403 F. Supp (N.D. Cal. 2019) (J. Freeman) ................................................................ 17, 20

25

26

*City of Los Angeles v. Citigroup Inc.,*
   24 F. Supp. 3d 940 (N.D. Cal. 2014) ................................................................................... 5

27

*Clorox Co. v. Reckitt Benckiser Grp. PLC,*
   398 F. Supp. 3d 623 (N.D. Cal. 2019) ...................................................................... 17, 18, 24

28

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
 173 F.3d 725 (9th Cir. 1999)................................................................................................. 20

*Colgate v. JUUL Labs, Inc.*,
 402 F. Supp. 3d 728 (N.D. Cal. 2019) ................................................................................. 19

*ConnectU v. Zuckerberg*,
 522 F.3d 82 (1st Cir. 2008) ............................................................................................... 6, 8

*DCD Programs, Ltd. v. Leighton*,
 833 F.2d 183 (9th Cir. 1987)................................................................................................ 25

*In re DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig.*,
 953 F.3d 890 (6th Cir. 2020) ................................................................................................. 7

*Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*,
 2020 WL 8768056 (C.D. Cal. Nov. 9, 2020) ....................................................................... 14

*DNA Sports Performance Lab, Inc. v. Major League Baseball*,
 2020 WL 4430793 (N.D. Cal. Aug. 1, 2020) ....................................................................... 18

*Doe v. WebGroup Czech Republic*,
 93 F.4th 442 (9th Cir. 2024)............................................................................................ 5, 12

*Exeltis USA Inc. v. First Databank, Inc.*,
 520 F. Supp. 3d 1225 (N.D. Cal. 2021) ............................................................................... 23

*Ferdik v. Bonzelet*,
 963 F.2d 1258 (9th Cir. 1992)................................................................................................ 7

*Herbal Brands, Inc. v. Photoplaza, Inc.*,
 72 F.4th 1085 (9th Cir. 2023)........................................................................................ 10, 11

*HomeLight, Inc. v. Shkipin*,
 694 F. Supp. 3d 1242 (N.D. Cal. 2023) ......................................................................... 17, 25

*Jackson v. Carey*,
 353 F.3d 750 (9th Cir. 2003)................................................................................................ 25

*Janus v. AFSCME*,
 585 U.S. 878 (2018) ............................................................................................................... 8

*Lew v. Moss*,
 797 F.2d 747 (9th Cir. 1986)............................................................................................ 9, 10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
 572 U.S. 118 (2014) ....................................................................................... 13, 16, 17, 22

*Lujan v. Defs. Of Wildlife*,
 504 U.S. 555 (1992) ..................................................................................... 13, 14, 15

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ............................................................................................ 13

*Maffick LLC v. Facebook, Inc.*,
    2021 WL 1893074 (N.D. Cal. May 11, 2021) ...................................................... 18

*Mavrix Photo, Inc. v. Brand Technologies, Inc.*,
    647 F.3d 1218 (9th Cir. 2011) ...................................................................... 11, 12

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ...................................................................... 14, 15

*Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*,
    858 F.2d 1376 (9th Cir. 1988) ............................................................................. 7

*Multicultural Radio Broad., Inc. v. Korean Radio Broad., Inc.*,
    2017 WL 436250 (D.N.J. Jan. 31, 2017) ............................................................. 7

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
    779 F.3d 1036 (9th Cir. 2015) ............................................................................. 7

*Openwave Messaging, Inc. v. Open-Xchange, Inc.*,
    2016 WL 6393503 (N.D. Cal. Oct. 28, 2016) .................................................... 18

*Oracle Am., Inc. v. TERiX Computer Co., Inc.*,
    2014 WL 31344 (N.D. Cal. Jan. 3, 2014) .......................................................... 23

*Peak Health Center v. Dorfman*,
    2019 WL 5893188 (N.D. Cal. Nov. 12, 2019) .............................................. 21, 23

*Pressroom Unions-Printers League Income Sec. Fund v. Continental Assur. Co.*,
    700 F.2d 889 (2d Cir. 1983) ................................................................................ 7

*Rauner v. AFSCME*,
    2015 WL 2385698 (N.D. Ill. May 19, 2015) ....................................................... 7

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457 (2007) ............................................................................................. 5

*Rosales v. United States*,
    824 F.2d 799 (9th Cir. 1987) ............................................................................... 9

*Ruppersberger v. Ramos*,
    2020 WL 1894400 (D. Haw. Apr. 16, 2020) ....................................................... 8

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ............................................................................. 9

*Soo Park v. Thompson*,
    851 F.3d 910 (9th Cir. 2017) ............................................................................. 19

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................... 14

*Stahl Law Firm v. Judicate W.*,
    2013 WL 4873065 (N.D. Cal. Sept. 12, 2013) ...................................... 16

*Strudley v. Santa Cruz County Bank*,
    2017 WL 4355129 (N.D. Cal. Sept. 29, 2017) ........................................ 8

*Strudley v. Santa Cruz County Bank*,
    747 F. App'x 617 (9th Cir. 2019) .......................................................... 7

*ThermoLife Int'l LLC v. Sparta Nutrition LLC*,
    2020 WL 248164 (D. Ariz. Jan. 16, 2020) .......................................... 14

*Ticketmaster-Indiana v. Cavaliers Operating Co.*,
    2008 WL 11383269 (C.D. Cal. Jan. 11, 2008) ...................................... 7

*TrafficSchool.com, Inc. v. Edriver, Inc.*,
    653 F.3d 820 (9th Cir. 2011) ......................................................... 14, 15

*United States v. Corinthian Colleges*,
    655 F.3d 984 (9th Cir. 2011) .............................................................. 19

*Walden v. Fiore*,
    571 U.S. 277 (2014) ........................................................................... 12

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................... 15

*Washer v. Bullitt Cnty.*,
    110 U.S. 558 (1884) ............................................................................. 5

*Whitmire v. Victus Ltd.*,
    212 F.3d 885 (5th Cir. 2000) ................................................................ 7

*Will Co. v. Lee*,
    47 F.4th 917 (9th Cir. 2022) ......................................................... 11, 12

*Wininger v. SI Mgmt., L.P.*,
    *33 F. Supp. 2d 838 (N.D. Cal. 1998)* ................................................ 25

## **Statutes**

15 U.S.C. § 1051 .......................................................................................... 5

28 U.S.C. § 1332(a)(1) ................................................................................. 6

Fla. Stat. § 97.041(4) (2024) ........................................................................ 9

Fla. Stat. § 97.051 (2024) ............................................................................. 9

## <u>Other Authorities</u>

Fed. R. Civ. P. 9(b)...........................................................................................23, 24

Fed. R. Civ. P.  11 ..................................................................................................5

Fed. R. Civ. P. 12(b)(6) .........................................................................................20

Fed. R. Civ. P. 15(a)(1) ...........................................................................................6

Fed. R. Civ. P. 15(a)(1)(B) .......................................................................................4

# INTRODUCTION

Defendants move to dismiss Plaintiffs' Amended Complaint (ECF 50, "FAC"), challenging subject matter and personal jurisdiction, Article III standing, and the sufficiency of the allegations. These arguments fail. They conflict with controlling case law, ignore this case's procedural history, and improperly dispute the pleading's factual allegations. The Court should deny the motion and lift its stay on discovery so that Plaintiffs can proceed with their case.

YMTC's breakthrough memory technology has transformed the market with superior performance and reliability. That has presented an existential challenge to one of YMTC's few competitors, U.S.-based Micron Technology. Instead of attempting to compete fairly, Micron has adopted a strategy built on theft and deception. In a separate case pending in this district, Micron is having to defend its infringement of 19 YMTC patents. At issue here is Micron's orchestration of a sophisticated disinformation campaign against YMTC. As Bloomberg and other investigative journalists have confirmed, Defendants are paid operatives, spreading lies for profit that YMTC is spying on Americans for the Chinese government and is involved in other criminal activities.

Defendants' primary instrumentality is a website called "China Tech Threat" (or "CTT"). Defendant Strand Consult owns it. Defendant Roslyn Layton co-founded it. Using CTT, Defendants launched an "astroturfing" campaign that paired false attacks on YMTC with promotions of Micron's products as a secure alternative. Their central falsehood is that the YMTC memory chips found in smartphones, tablets, and other devices enable the Chinese Communist Party and People's Liberation Army to spy on Americans. This is not only outrageously false, it is technologically impossible: YMTC's memory products store only data; they lack the components required for code execution, remote control, or wireless transmission to Beijing or anywhere else. Yet Defendants' smear campaign successfully pressured companies to terminate business relationships with YMTC, directly benefiting Micron. These actions violate the Lanham Act which prohibits false commercial speech deliberately designed to economically harm Plaintiffs.

Confronted with this action, Defendants now claim that their disinformation campaign is aligned with U.S. government positions. But that is another lie. The government has never endorsed Defendants' technologically impossible surveillance claims, much less the fiction that

"YMTC is associated with criminal activity, including a Social Security spoofing scam, identity theft, and cyber extortion," as Defendants have claimed.  Rather than litigate this action on the merits, Defendants seek refuge in their motion's procedural arguments.  The Court should reject each aspect of the motion:

*The Court has subject matter jurisdiction*:  The original Complaint asserted state law claims and invoked jurisdiction through diversity of citizenship.  The Amended Complaint replaced those claims with Lanham Act claims, which confer federal question jurisdiction.  Defendants ask the Court to assess subject matter jurisdiction based on the original complaint.  But the Supreme Court has rejected that approach: Subject matter jurisdiction is to be evaluated based on the Amended Complaint.  The Ninth Circuit has followed this rule.  Defendants' main authority consists of an unpublished Ninth Circuit memorandum disposition (*Strudley*) and a 40-year-old case that the Ninth Circuit has criticized and limited to its inapposite facts (*Morongo*).

*The Court has personal jurisdiction*: DCI has "purposefully directed" its astroturfing campaign toward a California entity to frustrate deals being negotiated in California.

*Plaintiffs have Article III standing*: The loss of Plaintiffs' market share, business reputation, and goodwill, as alleged in the complaint, are each legally cognizable injuries.

*Plaintiffs have plausibly alleged proximate cause under the Lanham Act*: Defendants' years-long astroturfing campaign has had its intended effect of hoodwinking consumers and businesses into believing that YMTC is toxic to do business with, damaging Plaintiffs' reputation and goodwill.  For these reasons, and those explained below, the Court should deny the motion.

## BACKGROUND

*Factual allegations.*  Plaintiffs are Yangtze Memory Technologies Company, Ltd. ("YMTC Ltd."), a developer and manufacturer of advanced memory chips, and Yangtze Memory Technologies, Inc. ("YMT Inc.," collectively, "YMTC" or "Plaintiffs"), YMTC Ltd.'s wholly owned U.S. subsidiary which facilitates and manages YMTC Ltd.'s business relationships in the United States.  FAC ¶¶ 20–21, 34.  Only a handful of companies compete in this market.  *Id.* ¶ 16.

Defendant Strand Consult, doing business as China Tech Threat, operates the website "chinatechthreat.com" and engages in public relations, with a focus on the telecommunications

industry. *Id.* ¶ 20. Defendant Roslyn Layton is Executive Vice President of Strand Consult and a co-founder of China Tech Threat. *Id.* ¶ 23. Defendant DCI Group AZ, L.L.C. ("DCI") is a public affairs firm known for "astroturfing" campaigns—a practice of disguising paid corporate advertising and promotion as independent third-party endorsements to gain competitive advantage in the marketplace. *Id.* ¶ 24; *see id.* ¶¶ 49–50 (detailing DCI astroturfing campaigns on behalf of Exxon and other companies); *see also See* Declaration of Aaron Perahia ("Perahia Decl."), Exs. B, C [articles on DCI's past astroturfing campaigns]. These stealth campaigns manipulate public opinion and government policy by masking the speaker's true commercial motives. *Id.* ¶¶ 24.

Micron is a memory chip manufacturer. *Id.* ¶ 6. Threatened by YMTC's ascension, Micron resorted to a sham marketing scheme to undermine YMTC's achievements by spreading lies about YMTC and its products. *Id.* ¶ 7. As Bloomberg reported in an article titled *Dell, Micron Backed a Group Raising Alarms on Rivals' China Ties*, Micron funded a website called "China Tech Threat" or "CTT," run by Defendants Roslyn Layton, Strand Consult, and DCI. *See id.*; *id.*, Ex. 1. In an interview about this lawsuit, Defendant Strand Consult's founder and CEO admitted that "[o]n the content on China Tech Threat, we have made money." *Id.* ¶ 9; *id.*, Ex. 2 at 3. DCI pays CTT to promote Micron's products and disparage YMTC's products. *Id.* ¶ 9.

CTT began its disinformation campaign as early as September 2020, publishing outlandish and false statements about YMTC. *Id.* ¶ 11. For example, CTT falsely claimed that YMTC was linked to "criminal activity, including a Social Security spoofing scam, identity theft and cyber extortion." *Id.*; *id.*, Ex. 3. CTT made up that lie, with no citation to any source. *See id.* ¶ 11.

CTT's website also includes a section titled "China's Army to Infiltrate iPhones with YMTC Chips," which is dedicated to spreading falsehoods inuring to Micron's commercial benefit. *Id.* CTT published a report titled *Silicon Sellout: How Apple's Partnership with Chinese Military Chip Maker YMTC Threatens National Security*. *Id.* ¶ 12; *id.*, Ex. 4 ("CTT Report"). The CTT Report implores "Apple [to] voluntarily end its partnership with YMTC" and "source its chips from existing suppliers like Micron[.]" *Id.* ¶ 12; *id.*, Ex. 4 at 4. It warns that "the Apple-YMTC deal will likely hasten the exit of an existing memory chip maker from a democratic country" and "could put at least one major non-Chinese semiconductor producer out of

business"—highlighting that "[t]he only American company" leading the memory market is "the Idaho-based Micron, which makes both DRAM and NAND chips." *Id.* ¶ 12; *id.*, Ex. 4 at 5–6, 8. The CTT Report contained other false and/or misleading statements about Plaintiffs' products:

- "YMTC chips equipped with spyware and installed on Apple devices could funnel collected data back to Beijing." *Id.* ¶ 53; *id.*, Ex. 4 at 11.

- "YMTC chips… present the possibility that malicious technology… from the Chinese military could be introduced to Apple end-users." *Id.* ¶ 64; *id.*, Ex. 4 at 5.

- "YMTC chips could be… intentionally compromised with rogue features… These built-in and concealed vulnerabilities would not be detected during manufacturing. They could be exploited … to disrupt performance or exfiltrate data." *Id.* ¶ 64; *id.*, Ex. 4 at 10.

- "Electronics with embedded chips are enabled with a 'kill switch'… Such features, under Chinese military production, could be enabled… to shut down remotely by an unauthorized Chinese government actor." *Id.* ¶¶ 53, 64; *id.*, Ex. 4 at 10.

Micron's objective is to eliminate YMTC as a competitor. *Id.* ¶ 17. CTT's false and misleading statements are part of an ongoing scheme orchestrated by Defendants and Micron, and potentially others, to damage YMTC and protect Micron's market share. *Id.* As Bloomberg reports: "While CTT presents as a standalone organization, it is actually a project of DCI Group, a public affairs and consulting firm with a history of 'astroturfing,' the technique of disguising corporate messaging as grassroots advocacy, according to people familiar with the matter and documents viewed by Bloomberg Businessweek." *Id.*; *id.*, Ex. 1 at 2–3.

Defendants' campaign has achieved its goal of disrupting YMTC's business, particularly in the U.S. and California. *Id.* ¶ 60. Defendants' false statements have damaged the reputation and goodwill of YMTC, its U.S. subsidiary, and its memory products, harming relationships with customers, prospective customers, and technical partners. *Id.* ¶¶ 4, 18, 28, 58–60.

***Procedural history.*** Plaintiffs sued Defendants Strand Consult and Roslyn Layton in June 2024 to clear their name and recover the losses Defendants' actions have caused. ECF 1. Plaintiffs' original complaint asserted only state law claims. *Id.* On November 17, Plaintiffs amended their complaint, as of right under Federal Rule of Civil Procedure 15(a)(1)(B), added DCI as a defendant, and added a federal claim under the Lanham Act. *See* FAC ¶¶ 24, 61–85.

Defendants contend this action lacks subject-matter jurisdiction and have repeatedly demanded dismissal.  Mot. 7.  They even threatened Rule 11 sanctions unless Plaintiffs dismissed the case.  Perahia Decl., ¶ 2; *id*., Ex. A at 5–6.  But Plaintiffs responded to this threat by providing supporting case law and addressing Defendants' arguments, highlighting conflicts with Supreme Court and Ninth Circuit precedent.  *Id*., Ex. A at 3–5.  Defendants never substantively responded. *Id.* at 2.  Instead, they filed this motion, again ignoring the cited authorities, and intend to pursue their arguments a third time with a Rule 11 motion.  *Id*.  Defendants, not Plaintiffs, are pursuing frivolous arguments—and doing so to suppress Plaintiffs' legitimate legal efforts.

## ARGUMENT

The Court should deny Defendants' motion to dismiss.  This court cannot resolve Defendants' Article III standing arguments because they are impermissibly intertwined with the merits of Plaintiffs' case.  *See City of Los Angeles v. Citigroup Inc.*, 24 F. Supp. 3d 940, 945 (N.D. Cal. 2014) (citing *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)).  And the court must take Defendants' personal jurisdiction allegations in the complaint as true, given the lack of an evidentiary hearing request.  *See Doe v. WebGroup Czech Republic*, 93 F.4th 442, 447 (9th Cir. 2024).  As shown below, Defendants cannot establish a lack of subject matter or personal jurisdiction.  Nor can they show that Plaintiffs lack Article III standing, or that Plaintiffs fail to state a claim under the Lanham Act for false advertising.

## I.    THE COURT HAS SUBJECT-MATTER JURISDICTION.

### A.    Subject Matter Jurisdiction is Based on the Amended Complaint

Defendants do not dispute that this Court has subject matter jurisdiction under the Lanham Act, 15 U.S.C. § 1051 *et seq*.  Instead, Defendants argue that the Court should ignore that claim because Plaintiffs first alleged it in the Amended Complaint.  Mot. 7–11.  But the Supreme Court has rejected that argument: "When a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474–75 (2007); *see Washer v. Bullitt Cnty.*, 110 U.S. 558, 562 (1884) (affirming subject matter jurisdiction based on amended complaint even though original complaint alleged amount in controversy that was too low);

1    *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1046 n.3 (9th Cir. 2000) (holding

2    subject matter jurisdiction should be judged by amended complaint "where the amended complaint

3    solidified rather than destroyed federal jurisdiction" by adding a federal claim).  Here, Plaintiffs

4    voluntarily amended their complaint as of right before Defendants moved to dismiss.

5        Defendants ignore the only published Circuit case that is on all fours with this case,

6    *ConnectU v. Zuckerberg*, 522 F.3d 82 (1st Cir. 2008), even though Plaintiffs brought it to

7    Defendants' attention before they filed their motion. Perahia Decl., Ex. A at 3–4.  *ConnectU*

8    addressed "whether an amended complaint that switches the basis of the district court's subject

9    matter jurisdiction from the existence of diversity of citizenship, 28 U.S.C. § 1332(a)(1), to the

10   existence of a federal question, *id.* § 1331, should be given effect when filed as of right before any

11   jurisdictional challenge has been mounted."  *Id.*  Plaintiffs did so here.

12       The plaintiff in *ConnectU*, like Plaintiffs here, first filed a diversity action based on state-

13   law claims and later amended the complaint as of right to add a federal claim, shifting the basis for

14   jurisdiction from diversity to federal question.  522 F.3d at 85.  The court held that this

15   amendment was proper, explaining that Rule 15(a)(1) allows a plaintiff to "switch jurisdictional

16   horses" before any jurisdictional challenge has been mounted.  *Id*. at 92; *see id.* (observing that

17   Rule 15(a)(1) permits a plaintiff to abandon "a claimed entitlement to diversity jurisdiction" and

18   substitute it with "a claimed entitlement to federal question jurisdiction").

19       *ConnectU* distinguished cases where a plaintiff seeks leave to amend before changing the

20   jurisdictional basis, emphasizing that an amendment as of right "operates mechanically" without

21   requiring the court's permission.  *ConnectU*, 522 F.3d at 95–96.  The court held that examining

22   the amended complaint, rather than the original complaint, for jurisdictional purposes is not an

23   improper assumption of jurisdiction to decide the merits.  *Id*. at 95.  Instead, it merely follows

24   Rule 15(a)(1).  The time-of-filing rule, which states that subject matter jurisdiction "depends on

25   the state of things at the time the action is brought" does not require a different result.  As

26   *Rockwell* makes clear, the "state of things and the originally alleged state of things are not

27   synonymous."  Here, Plaintiffs properly exercised their right to amend under Rule 15(a)(1) before

28   Defendants filed this motion.  And Plaintiffs' addition of a Lanham Act claim was only a change

1    to the "alleged" state of things rather than a change of actual facts to support jurisdiction, like

2    moving to a different state.  Thus, the Court properly has federal question jurisdiction.

3        None of Defendants' cited cases compel a different result.  Aside from *Strudley* (discussed

4    below), in each case Defendants cite, the plaintiff required leave to file the amended complaint.

5    *See Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1371 n.1

6    (9th Cir. 1988) (noting that plaintiff needed "leave of court before filing its amended complaint");

7    *Pressroom Unions-Printers League Income Sec. Fund v. Continental Assur. Co.*, 700 F.2d 889,

8    894 n.9 (2d Cir. 1983) (noting that plaintiff filed a "motion to amend"); *In re DePuy Orthos., Inc.*

9    *ASR Hip Implant Prods. Liab. Litig.*, 953 F.3d 890, 895 (6th Cir. 2020) (noting that "plaintiffs

10   moved to amend"); *Whitmire v. Victus Ltd.*, 212 F.3d 885, 889 (5th Cir. 2000) (noting plaintiff's

11   "motion for leave to amend"); *Multicultural Radio Broad., Inc. v. Korean Radio Broad., Inc.*,

12   2017 WL 436250, at *2 (D.N.J. Jan. 31, 2017) (noting that plaintiff "moves for leave to amend its

13   complaint").  And *Multicultural Radio*, which Defendants call "particularly instructive" (Mot. 16),

14   highlights this key distinction, explaining that "[w]hen a plaintiff amends the complaint as of right

15   the rules apply mechanically and the court's authority over the case is not brought to bear."  *Id.* at

16   *7 n.2 (quoting *Rauner v. AFSCME*, 2015 WL 2385698, at *3 (N.D. Ill. May 19, 2015)).

17       Defendants ignored this critical distinction and thus misapplied *Morongo Band*'s statement

18   that "[i]f jurisdiction is lacking at the outset, the district court has no power to do anything with

19   the case except dismiss."  858 F.2d at 1380.  When Plaintiffs filed the Amended Complaint

20   ***without court intervention***, the original complaint was rendered "irrelevant" and "non-existent,"

21   and the Court did not exercise its authority over a case for which it allegedly lacked jurisdiction.

22   *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992); *Ticketmaster-Indiana v. Cavaliers*

23   *Operating Co.*, 2008 WL 11383269, at *4 (C.D. Cal. Jan. 11, 2008) (distinguishing *Morongo*

24   *Band* because amendment was not as of right).  Indeed, the Ninth Circuit has recognized that the

25   *Morongo Band* holding is "more nuanced than the inflexibility suggested by its language."

26   *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1046 (9th Cir. 2015).

27       Defendants ultimately rely on *Strudley v. Santa Cruz County Bank*, 747 F. App'x 617 (9th

28   Cir. 2019) (Mem.).  But that case is an unpublished memorandum disposition, which has no

1   precedential force.  *See Banuelos-Ayon v. Holder,* 611 F.3d 1080, 1085 (9th Cir. 2010)

2   (unpublished dispositions "have no precedential force.").  And the case failed to acknowledge or

3   engage with the principles above.  Regardless, *Strudley* is readily distinguishable.  The plaintiffs

4   did not file an amended complaint until ***after*** the defendants had moved to dismiss.  *See Strudley*

5   *v. Santa Cruz County Bank,* 2017 WL 4355129, at *1 (N.D. Cal. Sept. 29, 2017).  Here, Plaintiffs

6   filed the Amended Complaint as of right ***before*** Defendants filed this Motion, which sets this case

7   apart from *Strudley* and Defendants' other cases.  *See ConnectU*, 522 F.3d at 95 (distinguishing

8   cases because "the plaintiff asked the district court to grant them leave to amend their complaint

9   after a jurisdictional challenge had been lodged (or, in some instances, adjudicated)").

10       **B.**      **Alternatively, the Court Can and Should Construe Plaintiffs' Amended**

11                **Complaint as a Newly Filed Action**

12           Even if the Supreme Court had not rejected Defendants' approach in *Rockwell Int'l Corp.*,

13   the Court can and should deny Defendants' motion by treating the Amended Complaint as a newly

14   filed action.  The Supreme Court and other Ninth Circuit courts have upheld this approach.  In

15   *Janus v. AFSCME*, 585 U.S. 878 (2018), the Governor of Illinois sued a union.  *Id.* at 889.  Three

16   state employees then moved to intervene on the Governor's side.  *Id.*  The district court held that

17   he lacked standing and, thus, there was no jurisdiction.  *Id.*  But "'in the interest of judicial

18   economy,' the court dismissed the Governor as a plaintiff, while allowing petitioner and the other

19   employees to file their own complaint."  *Id.*  The Supreme Court held that although "the District

20   Court docketed petitioner's complaint under the number originally assigned to the Governor's

21   complaint, instead of giving it a new number of its own," "Article III jurisdiction does not turn on

22   such trivialities."  *Id.* at 890; *see Ruppersberger v. Ramos*, 2020 WL 1894400, at *8–9 (D. Haw.

23   Apr. 16, 2020) (construing amended complaint as "the initiation of a new action"); *United States*

24   *ex rel. Atkins v. Reiten*, 313 F.2d 673, 675 (9th Cir. 1963) (holding that because no objection could

25   be raised "if at the time [plaintiff] filed his 'amended complaint' he had instead filed precisely the

26   same pleading as an initial complaint in a new action," requiring the plaintiff "to commence a new

27   and separate action in these circumstances would have been to insist upon an empty formalism").

28

**C.    Even Under the Original Complaint, Diversity Jurisdiction Existed.**

Defendants dispute the presence of diversity jurisdiction in the original complaint.  Mot. 7–8.  But the facts are sufficient to establish such jurisdiction.  "To demonstrate citizenship for diversity purposes a party must: (a) be a citizen of the United States, and (b) be domiciled in a state of the United States."  *Lew v. Moss*, 797 F.2d 747, 749 (9th Cir. 1986).  A person's "old domicile is not lost until a new one is acquired," and a "change in domicile requires the confluence of (a) physical presence at the new location with (b) an intention to remain there indefinitely."  *Id.* at 750.  Factors relevant to determining domicile include "current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes."  *Id.*

There are two types of attacks on subject-matter jurisdiction: facial and factual.  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  Defendants are launching a factual, rather than facial, attack on the citizenship of Roslyn Layton.  *See* Mot. 8.  A moving party "convert[s] the motion to dismiss into a factual motion by presenting affidavits or other evidence."  *Id.*  In ruling on a factual challenge, the court must take evidence and resolve factual disputes.  *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987).

To avoid being considered a U.S. citizen, Defendant Layton filed a declaration asserting that she has "lived in Denmark since 2010," "consider[s] it [her] home," and "intend[s] to remain in Denmark."  Mot., Ex. 5 ¶ 1.  Those assertions are not good enough.  "[D]omicile is evaluated in terms of objective facts," and "statements of intent are entitled to little weight when in conflict with the facts."  *Lew*, 797 F.2d at 75.  These are the objective facts:

- Layton admits that she is registered to vote in Florida, Mot., Ex. 5 ¶ 8.  That required her to swear an oath that she was a "legal resident of the State of Florida."  Fla. Stat. § 97.041(4) & 97.051 (2024).

- Layton admits that she has used the Florida home address in CTT correspondence. Mot., Ex. 5 ¶ 7.

- Despite Layton's assertion that she "ordinarily completes her work" for Strand Consult in Denmark and has no other employer, her website (Perahia Decl., Ex. D [https://roslynlayton.com/about-me]), says otherwise. It states that she *currently* holds positions and fellowships at Columbia Business School, Purdue University, and George Mason University, and that from 2013–20, she was a visiting fellow at the American Enterprise Institute.

These facts are sufficient to hold that, for purposes of jurisdiction, Layton is a U.S. citizen, of the State of Florida. Layton has the burden to produce evidence that she no long is. *See Lew*, 797 F.2d at 751 (imposing burden on party disputing personal jurisdiction and holding that merely moving from California to Hong Kong does not change one's domicile for jurisdictional purposes). Layton's affidavit does nothing to undermine her U.S. voter registration, her use of her Florida home's mailing address to conduct Strand business, nor her current positions at leading American universities. She has thus failed to meet her burden to explain away the circumstances surrounding her current claimed domicile. At a minimum, her affidavit entitles Plaintiffs to conduct jurisdictional discovery. *Myhre*, 298 F.R.D. at 641.

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER DCI.

Regardless of where DCI claims to be located, this Court has specific jurisdiction over it. The Ninth Circuit has established a three-part test for specific jurisdiction:

> (1)    The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2)    the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3)    the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable.

*Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1090 (9th Cir. 2023). "The plaintiff has the burden of proving the first two prongs. If the plaintiff meets that burden, the burden then

shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* (citations and internal quotation marks omitted).

In cases of intentional torts, the first prong asks whether the defendant "purposefully directed" its activities toward the forum. *See id.* at 1090–91 (applying the purposeful direction test to Lanham Act claims). The "purposeful direction" test is derived from *Calder v. Jones*, 465 U.S. 783 (1984), and "focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Id.* at 1091 (quoting *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011)). "The *Calder* effects test asks 'whether the defendant: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (quoting *Will Co. v. Lee*, 47 F.4th 917, 922 (9th Cir. 2022).

The Amended Complaint alleges that each defendant "intentionally directed false and misleading statements" through the CTT website (FAC ¶ 25), which satisfies the first prong. Defendants do not dispute this. As to the second prong, "operating even a passive website in conjunction with 'something more'—conduct directly targeting the forum—is sufficient." *Mavrix*, 647 F.3d at 1229 (citation omitted). Here, DCI directly targeted California by operating the CTT website "specifically to influence California business decisions and harm YMTC's California operations." FAC ¶ 27. The publication that forms the basis of this case is a call for Apple, headquartered in California, to end its partnership with YMTC and, by implication, its California subsidiary. *Id.* ¶ 29; *id.*, Ex. 4 at 4. Plaintiffs also allege that DCI did this for its own profit. *Id.* ¶ 2. "[W]here, as here, a website with national viewership and scope appeals to, and profits from, an audience in a particular state, the site's operators can be said to have 'expressly aimed' at that state." *Mavrix*, 647 F.3d at 1231.

Moreover, the allegations regarding the technical infrastructure of the CTT website, which Defendants do not dispute, independently constitute "express aiming" at California. DCI, on behalf of Micron and for the use of Defendants Strand Consult and Layton, solicited the use of Cloudflare, which provides its services ***from California***, to increase the speed at which its site could be accessed ***in California*** and to conceal its identity as the site's operator. *See* FAC ¶ 26.

"By using [California]-based CDNs to improve the viewing experience of persons near those CDNs, and by allowing CDN providers to pull content onto the [California]-based CDNs' servers to do so, [DCI] ha[s] differentially targeted [California] visitors in a way that, under *Will* [*Co., Ltd. v. Lee*, 47 F.4th 917 (9th Cir. 2022)], constitutes express aiming at the [California] market." *Doe v. WebGroup Czech Republic*, 93 F.4th 442, 453 (9th Cir. 2024). If Defendants dispute their express aiming, the Court should permit jurisdictional discovery on this point.

The third prong of the *Calder* test is also satisfied. First, in publishing its lies about YMTC, DCI intentionally and foreseeably harmed YMTC's business relationships in California. FAC ¶ 28; *see Mavrix*, 647 F.3d at 1232 (holding that defendants who destroyed California-based value of plaintiff's business satisfied *Calder*'s third prong). Second, YMT Inc. has foreseeably suffered harm within California, given that its principal place of business is located there. *See Mavrix*, 647 F.3d at 1232 (noting that a corporation suffers harm for purposes of *Calder*'s third prong "where the corporation has its principal place of business").

Finally, Plaintiffs' Lanham Act claim "arises out of" DCI's forum-related activities described above, including the statements addressed to Apple and calculated to harm YMT Inc., because those statements form the basis of Plaintiffs' claims. Defendants have not tried to satisfy their burden to show that the exercise of personal jurisdiction would be unreasonable.

DCI raises three arguments as to why the CTT Report does not target California. None is correct. First, DCI argues that "the FAC does not allege that DCI Group had anything to do with the June 2022 Report published by CTT." Mot. 17. Not so. Plaintiffs allege that DCI participated in the content on CTT, including the CTT Report. FAC ¶¶ 45–46. This is supported by the fact that sentences contained in the CTT Report were also contained *verbatim* in a prior report that listed a DCI employee as the author in metadata which DCI neglected to scrub. *Id.* ¶¶ 43–44.

Second, DCI argues that "the 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." Mot. 17 (citing *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). But DCI directed its statements to a California audience, which goes beyond merely harming a California plaintiff. And post-*Walden*,

1  the Ninth Circuit has reaffirmed *Mavrix*'s holding that speaking to an audience in a state is express

2  aiming at that state.  *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1211 n.7 (9th Cir. 2020).

3        Third, DCI claims that "the FAC never alleges that the California entity—as opposed to

4  the Chinese parent company—ever had any relationship with Apple, nor that Apple actually

5  terminated whatever relationship it may have had with either Plaintiff."  Mot. 17.  The Amended

6  Complaint alleges that "YMTC maintains its ties to Silicon Valley through its wholly owned

7  subsidiary YMT Inc."  FAC ¶ 34.  And Plaintiffs do not have to allege contacts with Apple to

8  establish either "aiming" or "purposeful availment" with California.  It is enough that Plaintiffs

9  allege that "YMT Inc. . . . engaged in business discussions with prospective customers in Northern

10  California during 2022," and that DCI "knowingly timed and published on the China Tech Threat

11  website to disrupt these discussions, directly and foreseeably harm[ing] YMT Inc.'s business

12  relationships."  *Id.* ¶28 (emphasis added).  Plaintiffs have adequately alleged that business

13  discussions that were intentionally and knowingly disrupted were taking place between YMT Inc.

14  and other California companies, which constitutes "express aiming" at California.

15        In sum, DCI purposefully availed itself of doing business in California by calling on one

16  California entity to not do business with another California entity.  Plaintiffs' claims relate to

17  DCI's conduct because Plaintiffs are suing based on the document that contained those statements.

18  **III.  PLAINTIFFS HAVE ARTICLE III STANDING TO ASSERT THEIR CLAIMS.**

19        For Article III standing, a plaintiff "must have suffered or be imminently threatened with a

20  concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the

21  defendant and likely to be redressed by a favorable judicial decision."  *Lexmark Int'l, Inc. v. Static*

22  *Control Components, Inc.*, 572 U.S. 118, 125 (2014).  "At the pleading stage, general factual

23  allegations of injury resulting from the defendant's conduct may suffice for, on a motion to

24  dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to

25  support the claim.'"  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l*

26  *Wildlife Fed'n*, 497 U.S. 871, 872 (1990)).  Allegations of "lost sales and damage to business

27  reputation" are sufficient for Article III standing.  *Lexmark*, 572 U.S. at 125.

28

Plaintiffs have suffered an injury in fact and have alleged that injury in the Amended Complaint.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).  "[E]conomic injury is generally a legally protected interest."  *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 (9th Cir. 2013).

The Amended Complaint repeatedly alleges that Plaintiffs "suffered substantial injury, including harm to YMTC's reputation and goodwill, resulting in lost sales, revenue, opportunities, and market share, as well as expenses incurred to mitigate the harm caused by Defendants' false statements."  FAC ¶ 69; *see also id.* ¶¶ 18, 29, 59, 60.  Those allegations adequately allege an injury in fact at this stage of the case.  *See ThermoLife Int'l LLC v. Sparta Nutrition LLC*, 2020 WL 248164, at *4 (D. Ariz. Jan. 16, 2020) (standing adequately pleaded at "the motion to dismiss stage" by alleging harm to "business, reputation and good will" and "lost sales and profits"); *Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, 2020 WL 8768056, at *5 (C.D. Cal. Nov. 9, 2020) (plaintiff does not need to identify specific lost sales at the pleading stage, so long as it alleges damages flowing from the false statements in the form of lost sales).

Plaintiffs' injury is fairly traceable to Defendants' false advertising of Plaintiffs' products.  At the pleading stage, a plaintiff needs to allege only a "line of causation" that is "more than attenuated."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (internal quotation marks omitted).  A causation chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.  *Id.*  Here, Plaintiffs have alleged that Defendants' disinformation campaign was "intended to discourage customers and potential purchasers from conducting business with YMTC," calling on companies to "source memory chips from non-Chinese chipmakers like Micron."  FAC ¶ 58.  The only other step in the chain is that the campaign had its intended effect, which the Amended Complaint also alleges: "YMTC lost business opportunities with prospective customers and technical partners."  *Id.* ¶ 59.

Plaintiffs adequately plead standing under the framework established by *TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820 (9th Cir. 2011).  "In a false advertising suit,

a plaintiff establishes Article III injury if some consumers who bought the defendant's product under a mistaken belief fostered by the defendant would have otherwise bought the plaintiff's product." *Id.* at 825 (internal quotation marks omitted). A plaintiff can do so by "creating a chain of inferences showing how defendant's false advertising could harm plaintiff's business." *Id.* There, a driver's education course provider sued DMV.org, which was not affiliated with any state's Department of Motor Vehicles but also provided driver's education courses. *Id.* at 824. The plaintiffs competed with the defendants for referral fees earned by pointing users to third-party driver's ed websites. *Id.* The plaintiffs presented evidence that a recommendation by the DMV is an important factor in consumers' choice of driver's ed classes. *Id.* at 826. The court held that, because "[s]ales gained by one [were] likely to come at the other's expense," the plaintiffs had adequately established an injury for Article III standing. *Id.* Importantly, *TrafficSchool.com* was a summary judgment decision, when evidence is required. *Lujan*, 504 U.S. at 561. That is not required here. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Plaintiffs have alleged that "DCI pays China Tech Threat on behalf of Micron for China Tech Threat to disseminate favorable messages about Micron's products and disparaging messages about YMTC's competing products." FAC ¶ 9. "With a limited number of major chip manufacturers globally, a failed deal for YMTC materially increased Micron's likelihood of securing those deals, a dynamic that played out in the market." *Id.* ¶ 16. "Consumers and businesses, particularly in the technology sector, are sensitive to national security concerns and the potential for data breaches and cyberattacks." *Id.* ¶ 68. Plaintiffs have thus adequately alleged that Defendants' deception "directly influenced the purchasing decisions of these audiences, causing them to refrain from purchasing products with YMTC chips and from doing business with YMTC, thereby directly and foreseeably harming YMTC's sales, revenue, and market share." *Id.*

Defendants' two contrary arguments are untenable. They argue first that Plaintiffs failed to allege injury because "Defendants and YMTC are not direct competitors." Mot. 12. But the case

Defendants cite pre-dates *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), which rejected Ninth Circuit cases holding that direct competition is an element of a Lanham Act claim. *See* 572 U.S. at 134 (rejecting notion that only direct competitors may sue); *see also Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1120 (9th Cir. 2021) (recognizing the Supreme Court's likely abrogation). Further, Plaintiffs have alleged that the false statements were published on behalf of Micron, a direct YMTC competitor. *See* FAC ¶ 7 (Micron funded CTT), ¶ 9 (DCI pays CTT on behalf of Micron), ¶ 17 ("scheme orchestrated by Defendants and Micron"), ¶¶ 39–40 (Micron "astroturfed" CTT's false speech), ¶ 41 ("DCI surreptitiously provid[ed] content to China Tech Threat on Micron's behalf and under Micron's direction[.]").

Defendants also cite case in which the plaintiff's alleged harms are "too general" to support Article III standing. Mot. 12–13. But those cases are inapposite. In *Allbirds, Inc. v. Giesswein Walkwaren AG*, 2020 WL 6826487 (N.D. Cal. June 4, 2020), the plaintiff "only allege[d] in a conclusory fashion that it is a direct[] competitor of [defendant] and that 'the fact that [defendant] makes false advertising claims about its products that directly compete with [plaintiff] alone establishes Article III standing….'" *Id.* at *4. Similarly, in *Stahl Law Firm v. Judicate W.*, 2013 WL 4873065 (N.D. Cal. Sept. 12, 2013), the plaintiff relied on a bare allegation that it was a direct competitor. *See id.* at *3–*5. Plaintiffs here have not pleaded the conclusion that YMTC and Micron are direct competitors, Plaintiffs have alleged that:

> Consumers and businesses, particularly in the technology sector, are sensitive to national security concerns and the potential for data breaches and cyberattacks. The false and misleading claims of spyware, Chinese government control, and criminal activity that Defendants disseminated were designed to exploit these sensitivities and cause deception among the relevant purchasing public. This deception directly influenced the purchasing decisions of these audiences, causing them to refrain from purchasing products with YMTC chips and from doing business with YMTC, thereby directly and foreseeably harming YMTC's sales, revenue, and market share.

FAC ¶ 68. The Amended Complaint goes on to allege that "Micron, as YMTC's direct competitor in the relevant market, directly and proximately benefited from this harm by capturing market share, sales, and/or revenue that otherwise would have gone to YMTC." *Id.* ¶ 69.

Plaintiffs have pleaded damages in the form of loss of sales and goodwill. That is an injury that the law recognizes. And Plaintiffs have adequately pleaded that Defendants caused

1    these harms because that is precisely what their publication called for.  Defendants' arguments to

2    the contrary confuse the procedural posture of the case and conflate jurisdiction with the merits.

3    **IV.    PLAINTIFFS HAVE STANDING UNDER THE LANHAM ACT.**

4    For standing, a plaintiff must plead "an injury to a commercial interest in sales or business

5    reputation proximately caused by the defendant's misrepresentations."  *Clorox Co. v. Reckitt*

6    *Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 645 (N.D. Cal. 2019); *see also Cisco Sys., Inc. v.*

7    *Beccela's Etc.*, 403 F. Supp at 830 (N.D. Cal. 2019) (J. Freeman) (similar).  Allegations that a

8    plaintiff has "suffered direct diversion of sales and lost profits" that it "would have otherwise

9    earned" and that those "advertisements have damaged its goodwill, reputation, and standing with

10   the consuming public … are sufficient[.]"  *Clorox*, 398 F. Supp. 3d at 645; *see also Lexmark*, 572

11   U.S. at 138 ("When a defendant harms a plaintiff's reputation by casting aspersions on its

12   business, the plaintiff's injury flows directly from the audience's belief in the disparaging

13   statements."); *see also id.* ("[A] defendant who seeks to promote his own interests by telling a

14   known falsehood to or about the plaintiff or his product may be said to have proximately caused

15   the plaintiff's harm.") (quotations and citations omitted).  Plaintiffs have met this standard.

16   Similar to the plaintiff in *Clorox* and contrary to Defendants' assertion that the "FAC fails

17   to plead that any alleged reputational harm was proximately caused by Defendants" or "YMTC

18   fails to establish how the challenged statements have specifically affected YMTC's sales or

19   business reputation" (Mot. 13–14), the Amended Complaint explicitly alleges that "[a]s a direct

20   and proximate result of Defendants' false and misleading advertising and promotion, YMTC

21   suffered substantial injury, including harm to YMTC's reputation and goodwill, resulting in lost

22   sales, revenue, opportunities, and market share, as well as expenses incurred to mitigate the harm

23   caused by Defendants' false statements."  *See* FAC ¶¶ 69, 82; *see also id.* ¶ 60 ("Defendants' false

24   statements damaged the reputation and goodwill of YMTC, its U.S. subsidiary, and its memory

25   products, harming relationships with customers, prospective customers, and technical partners.").

26   The Amended Complaint cites statements in which Defendants disparage Plaintiffs (*see*

27   FAC ¶¶ 11–12, 14, 43, 51–53), unlike the complaint in *HomeLight, Inc. v. Shkipin*, 694 F. Supp.

28   3d 1242, 1255 (N.D. Cal. 2023) ("none of the statements are alleged to disparage or even refer to

1   [the plaintiff], so [the plaintiff] cannot plausibly allege any reputational harm.")  Plaintiffs do not

2   need to plead more, such as "the customers' names," "the specific timeframes when they told

3   [Plaintiffs] their views were tarnished," or "which specific individuals were present." *Openwave*

4   *Messaging, Inc. v. Open-Xchange, Inc.,* 2016 WL 6393503, at *5 (N.D. Cal. Oct. 28, 2016) ("This

5   is too granular at the pleading stage; discovery may provide these details.  [Plaintiff's] allegations

6   sufficiently establish a plausible proximate causal relationship between [the defendant's] alleged

7   conduct and [the plaintiff's] alleged injury."); *see also Clorox,* 398 F. Supp. at 645.

8           Defendants also argue that "YMTC fails to establish how the challenged statements have

9   specifically affected YMTC's sales or business reputation."  Mot. 14–15 citing *Maffick LLC v.*

10   *Facebook, Inc.*, 2021 WL 1893074, at *5 (N.D. Cal. May 11, 2021) and *DNA Sports Performance*

11   *Lab, Inc. v. Major League Baseball*, 2020 WL 4430793, at *4 (N.D. Cal. Aug. 1, 2020).  But the

12   Amended Complaint does exactly that.  It states that Defendants' "deception directly influenced

13   the purchasing decisions of [the purchasing public], causing them to refrain from purchasing

14   products with YMTC chips and from doing business with YMTC" because of consumers' and

15   business' sensitivities "to national security concerns and the potential for data breaches and

16   cyberattacks."  FAC ¶ 68.  The Amended Complaint also explains how this harm occurred: "After

17   Defendants published the false and misleading CTT Report, YMTC lost business opportunities

18   with prospective customers and technical partners," "disrupted pending transactions," and "cost[]

19   YMTC hundreds of millions of dollars in potential sales of 3D NAND flash memory products to

20   leading computer and consumer electronics manufacturers, including companies in this judicial

21   district."  *Id.* ¶ 59.  Even under Defendants' cases, these allegations are sufficiently specific to

22   establish a direct connection between Defendants' statements and Plaintiffs' injuries, and thus

23   allege proximate cause.  *See Maffick*, 2021 WL 1893074, at *5 (plaintiff should provide clues

24   about how a defendant's statements "might have affected the 'economic decisions by [the

25   plaintiff's] existing and potential customers and "how those 'decisions' caused a commercial

26   injury to [the plaintiff's] sales or business reputation."); *DNA Sports*, 2020 WL 4430793, at *4

27   (plaintiff can establish causation "by alleging, for example, a clear diversion of sales … or lost

28   contracts upon publication of" the defendant's false statements).

1    Finally, Defendants rely on matter outside the Amended Complaint to argue that Plaintiffs

2    cannot establish that the "CTT publications directly led to a loss in YMTC's sales or goodwill."

3    Mot. 14.  This fails on multiple fronts.  First, "[a]s a general rule, [courts] may not consider any

4    material beyond the pleadings" in ruling on a motion to dismiss.  *United States v. Corinthian*

5    *Colleges*, 655 F.3d 984, 998 (9th Cir. 2011).  None of Defendants' exhibits were submitted with,

6    referred to, or are central to Plaintiffs' claims.  *Id.* at 999. Even if these documents were publicly

7    available (Mot. 25), the Court may not "take judicial notice of facts favorable to Defendants that

8    could reasonably be disputed."  *Id.*  But facts alleged in the Amended Complaint dispute that

9    Plaintiffs "pose[d] a significant risk of becoming involved in activities contrary to the national

10    security and foreign policy interests of the United States" (Mot. 14).  *See, e.g.*, FAC ¶¶ 14, 53.

11    Second, none of the exhibits Defendants have sought to add to the consideration of the

12    pleading are of any consequence because all were foreseeable subsequent acts caused by

13    Defendants.  The Amended Complaint alleges that Defendants' disinformation campaign began

14    "as early as September 2020" (FAC ¶¶ 11) and attaches articles that are dated January 4, 2021 (*id.*,

15    Ex. 3), July 13, 2021 (*id.*, Ex. 6), November 2021 (*id.*, Ex. 7), and "June 2022" (*id.*, Ex. 4).  By

16    comparison, only one of Defendants' exhibits falls within this timeframe (*see* Mot., Ex. 1 at 1

17    (dated "June 2021")), the rest came later.  *Id.*, Ex. 2 at 77505 (December 19, 2022); *id.*, Ex. 3 at 1

18    (January 31, 2024).  Thus, because these publications came ***after*** the CTT repeatedly called on the

19    U.S. government to engage in actions adverse to Plaintiffs (including, *e.g.*, "adding YMTC to the

20    entity list" (FAC, Ex. 4 at 14) and "implement[ing] controls to stop the flow of SME to China"

21    citing the "rise of … YMTC" (*id.*, Ex. 3 at 2)), these cited publications were foreseeable and

22    cannot be a superseding cause of Plaintiffs' harm.  *See Colgate v. JUUL Labs, Inc.*, 402 F. Supp.

23    3d 728, 761 (N.D. Cal. 2019) ("A superseding cause must be something more than a subsequent

24    act in a chain of causation; it must be an act that was not reasonably foreseeable.").

25    At best, Defendants' documents introduce a question of fact that cannot be resolved in

26    their favor at the motion to dismiss stage.  *Soo Park v. Thompson*, 851 F.3d 910, 922 n.12 (9th Cir.

27    2017) (reversing and remanding district court's granting of motion to dismiss stating "The issues

28

1  of proximate causation and superseding cause involve application of law to fact, which is left to

2  the factfinder, subject to limited review.") (brackets omitted).

3  **V.      PLAINTIFFS HAVE ADEQUATELY ALLEGED LANHAM ACT CLAIMS.**

4          To prevail, Plaintiffs must show that: (1) Defendants made a false statement of fact in a

5  commercial advertisement; (2) the statement deceived or has the tendency to deceive a substantial

6  segment of its audience; (3) the deception is material; (4) Defendants caused the false statement to

7  enter interstate commerce; and (5) Plaintiffs have been or are likely to be injured as a result of the

8  false statement.  *Beccela's Etc.*, 403 F. Supp. 3d at 826–27.  Defendants take issue with only the

9  first element, arguing that "CTT Publications are not 'commercial advertising or promotion'" and

10  none of the statements made in the CTT Reports are "false or misleading."  Mot. 19.  Defendants

11  have implicitly conceded that the Amended Complaint meets the other four elements.  And they

12  are wrong about the first element, as discussed next.

13          **A.      Defendants Engaged In Commercial Advertising or Promotion.**

14          According to Defendants, commercial advertising or promotion requires "(1) commercial

15  speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of

16  influencing consumers to buy defendant's goods or services."  Mot. 20 (citing *Coastal Abstract*

17  *Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir. 1999).  (*Coastal Abstract* raised

18  a fourth element, that statements "must be disseminated sufficiently to the relevant purchasing

19  public to constitute 'advertising' … within that industry."  Defendants have not addressed it; and

20  the Amended Complaint already alleges it.  *See* FAC ¶ 26.)

21          Defendants argue that the Court can resolve this issue in their favor on the pleadings.

22  Throughout their argument, Defendants rely on *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107

23  (9th Cir. 2021).  *See* Mot. 20–22.  But Defendants have misinterpreted the case.  In *Ariix*, the

24  defendant, NutriSearch, portrayed itself as an independent company that presented "only objective

25  data and scientific analyses to the public" in its guide to nutritional supplements.  *Id.* at 1111.

26  Ariix sued NutriSearch under the Lanham Act for false advertising, alleging that NutriSearch was

27  colluding with Ariix's competitor, Usana, to secretly rig ratings to favor Usana in exchange for

28  compensation.  *Id.* at 1111–13.  In reviewing an order granting a Rule 12(b)(6) motion, the Ninth

1   Circuit held that NutriSearch's publications met the first and second elements cited above, but

2   remanded the case for further consideration of the third element. *Id.* at 1116–20. Under the

3   court's holding, as discussed below, the Amended Complaint's allegations sufficiently allege that

4   Defendants' statements constitute "commercial advertising or promotion."

5          ***First element ("commercial speech")***: For purposes of determining whether a statement

6   constitutes "commercial speech" under the Lanham Act, courts in the Ninth Circuit rely on the

7   Supreme Court's standard set forth in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68

8   (1983). *See Ariix,* 985 F.3d at 1116 (citing *Bolger*'s non-exclusive "commercial speech" factors,

9   including whether "(1) the speech is an advertisement, (2) the speech refers to a particular product,

10  and (3) the speaker has an economic motivation").

11         Defendants dispute that their statements meet that standard, citing *Peak Health Center v.*

12  *Dorfman*, 2019 WL 5893188 (N.D. Cal. Nov. 12, 2019). Mot. 21. That case held that an article

13  critical of the plaintiff's products was not "commercial speech" under the Lanham Act because "it

14  contains nothing that can plausibly be characterized as advertising or promoting [defendant's] own

15  products (***or anyone else's***)." *Id.* at *7 (emphasis added). That cannot be said about Defendants'

16  CTT Report, which, as detailed in the Amended Complaint, "repeatedly implores 'Apple [to]

17  voluntarily end its partnership with YMTC' and 'source its chips from existing suppliers like

18  Micron'" because YMTC is selling products that enable the Chinese government to spy on

19  Americans through their smart phones and computers. FAC ¶¶ 12, 14 (quoting the CTT Report).

20         As with the guide in *Ariix*, even if the CTT Report is not "in the traditional form of an

21  advertisement," that "does not tell [the Court] much, especially given today's sophisticated and

22  subtle marketing campaigns." *Ariix*, 985 F.3d at 1116. *Ariix* recognized that even speech that

23  does not "propose a commercial transaction on its face can still be commercial speech." *Id.* at

24  1115 (citing *Bolger*, 463 U.S. at 66–68 (pamphlets that discussed a matter of public concern but

25  that mentioned the name of a product and were motivated by profit were commercial speech)).

26         Those considerations support the conclusion that Defendants' statements about Plaintiffs

27  constitute commercial speech under the Lanham Act. As in *Bolger*, the CTT Reports refer to

28  specific products, YMTC's 3D NAND chips. FAC ¶¶ 11–12, 14, 43, 51, 53. And John Strand has

1  admitted: "On the content on [CTT], we have made money." *Id.* ¶ 9.  By relying on the

2  Bloomberg and NOTUS articles that note Micron's involvement in the CTT Report (*id.* ¶¶ 7, 9,

3  17, 39, 45 & 48), Plaintiffs have "alleged enough to make it plausible that [Defendants] published

4  the [CTT Report] mainly to reap the financial benefits of a hidden marketing arrangement with

5  [Micron] rather to inform consumers about [YMTC's products]." *Ariix*, 985 F.3d at 1117.

6      ***Second element (in "competition with plaintiff")***:  Contrary to Defendants' argument, the

7  defendant does not have to be in competition with the plaintiff for its statements to constitute

8  commercial speech.  That was the Supreme Court's decision in *Lexmark International, Inc. v.*

9  *Static Control Components, Inc.*, 572 U.S. 118 (2014) which Defendants cite (Mot. 13) but ignore

10  on this issue.  The Supreme Court abolished any such requirement that a defendant be in

11  "commercial competition" with the plaintiffs, as noted in Section III.C *supra*.  *See Lexmark*, 572

12  U.S. at 136 ("It is thus a mistake to infer that because the Lanham Act treats false advertising as a

13  form of unfair competition, it can protect *only* the false-advertiser's direct competitors."); *see also*

14  *Ariix*, 985 F.3d at 1120 ("[T]he parties agreed that [*Lexmark*] likely abrogated this element.").

15      ***Third element (statements made "for the purpose of influencing consumers to buy***

16  ***defendant's goods")***: Defendants argue that, because they "lack [] commercial competition" with

17  Plaintiffs  (Mot. 22), their statements about Plaintiffs could not have been made for the purpose of

18  influencing the purchase of their goods.  But it does not matter that Defendants are not sellers of

19  memory products.  Where there is "a clear financial arrangement designed to influence consumers

20  to buy products from a third-party in which Defendants had a direct financial stake" and an

21  "agency relationship" between Defendants and a third-party, this element is satisfied.  *Ariix, LLC*

22  *v. Nutrisearch Corp.*, 2023 WL 2933306, at *4–*6 (S.D. Cal. Apr. 13, 2023).

23      Both are present here.  The Amended Complaint alleges that there was a financial

24  arrangement between Micron, DCI, and CTT.  FAC ¶ 9.  DCI has been reported to "disguis[e]

25  corporate messaging as grassroots advocacy" (*id.* ¶ 17) and has even gone as far as to operate

26  websites to "promote its corporate clients' goods, services, and commercial activities" (*id.* ¶ 49).

27  This is corroborated here by NOTUS's independent reporting which found that "DCI Group

28  employees were included in the metadata of documents embedded on the [CTT] website" that

1    spread egregious lies about Plaintiffs' products.  *Id.* ¶¶ 42–44.  Thus, it can reasonably be inferred

2    that there was a "hidden financial agreement between Defendants" and Micron which "financially

3    incentivized" DCI to promote Micron and tarnish Plaintiffs (*see Ariix*, 2023 WL 2933306 at *4).

4         Additionally, the Amended Complaint pleads an agency relationship existed by alleging

5    that Micron and DCI both consented to DCI acting on behalf of Micron.  Citing Bloomberg , the

6    Amended Complaint states that "Micron funded [CTT] … to engage in advocacy 'align[ed] with

7    [its] corporate interests.'"  FAC ¶ 39.  In return, as reported by NOTUS, Strand's CEO admitted

8    that Strand "made money" on CTT.  *Id.* at 9.  Moreover, Defendants acted with actual authority

9    when they made statements that " constituted coordinated and paid-for commercial advertising for

10   Micron" (*id.* ¶¶ 66, 79), which were likely "'consistent' with' [Micron's] 'general statement of

11   what [Defendants were] supposed to do'" (*see Ariix*, 2023 WL 2933306 at *6).

12        Defendants' cases are inapposite.  Mot. 22–23.  In *Exeltis USA Inc. v. First Databank, Inc.*,

13   the court found that the defendant's actions were not commercial advertising or promotion, in part

14   because the defendant was merely a database provider and not alleged to have "an agency

15   relationship" or "any other sort of financial stake in specific sales of a product."  520 F. Supp. 3d

16   1225, 1235 (N.D. Cal. 2021).  And in *Peak Health*, nothing in the "investigative report" could be

17   characterized as promoting anyone's products.  2019 WL 5893188 at *7.  But, as discussed,

18   Defendants had a financial incentive to promote Micron's products.

19        **B.    <u>Plaintiffs Properly Pleaded That Defendants' Statements Were False.</u>**

20        Defendants argue that the Amended Complaint's allegations fail to satisfy Rule 9(b)'s

21   elevated pleading standards for fraud.  Mot. 23.  But some Northern District courts have declined

22   to apply Rule 9(b) when evaluating false advertising claims.  *Oracle Am., Inc. v. TERiX Computer*

23   *Co., Inc.*, 2014 WL 31344, at *10 (N.D. Cal. Jan. 3, 2014) (declining to apply Rule 9(b) and

24   denying dismissal of plaintiff's false advertising claim, noting that "the Ninth Circuit itself has

25   never held as such"); *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, 2008 WL 6742224,

26   at *4 (N.D. Cal. Dec. 18, 2008) (same).

27        Even if Rule 9(b) were to apply here, the Amended Complaint meets its heightened

28   standard.  Under Rule 9(b), Plaintiffs must allege the "who, what, when, where, and how" of the

1    false statements, "must set forth what is false or misleading about a statement, and [explain] why

2    it is false." *Clorox*, 398 F. Supp. 3d at 634 (finding Lanham Act claim adequately alleged and

3    denying motion to dismiss). Here, Defendants concede that the Amended Complaint adequately

4    "allege[s] the 'what' and 'where' for each of the five identified statements." Mot. 24. And the

5    Amended Complaint also meets Rule 9(b)'s requirements as to "who" (Defendants Strand

6    Consult, Roslyn Layton, and DCI Group (FAC ¶¶ 7, 22–24, 41), "when" (from 2020 through 2022

7    (*id.* ¶¶ 11–12, 41, 51–52, 64, 77)), and "how" ("through various channels, including the [CTT]

8    website" (*id.* ¶¶ 41, 62–63, 65, 75–76, 78)).

9        Defendants claim that the Amended Complaint fails to adequately plead only "why" any of

10   the challenged statements are false or misleading. Mot. 24–25. But for each statement that alleges

11   that Plaintiffs' chips contain "spyware," "malicious technology," "rogue features," or a "kill

12   switch," the Amended Complaint explains "why" these accusations are false and, indeed,

13   infeasible. The Amended Complaint states that YMTC's memory chips, unlike microprocessors,

14   do not and cannot execute code and, like other memory devices, lack "basic components necessary

15   for remote control and wireless communications—*e.g.*, antennas, modems, RF processors, and

16   more." FAC ¶¶ 14, 64(e), 77(e). The Amended Complaint also calls out Defendants' citation to

17   ***works of fiction*** to support these baseless claims (*id.* ¶ 53) and notes that YMTC could not make a

18   chip with these capabilities without the device manufacturer knowing (*id.* ¶ 14).

19       Defendants also argue that the Amended Complaint fails to explain why claims that

20   "YMTC is associated with criminal activity, including a Social Security spoofing scam, identity

21   theft, and cyber extortion" (Mot. 24–25) are false or misleading. That, too, is untrue. The

22   Amended Complaint makes clear that CTT has cited no support for such claims and denounces

23   these accusations as "made [] up" and "fiction." FAC ¶ 11. The Amended Complaint alleges in

24   detail that Plaintiffs are at the forefront of 3D NAND flash memory design and have invested

25   significant resources to earn widespread acclaim for their products. *Id.* ¶¶ 33–36. Plaintiffs'

26   accomplishments have also earned them the opportunity to supply their advanced memory chips to

27   a leading global designer and manufacturer of consumer computing products. *Id.* ¶ 37. Taking

28   these allegations as true and construing them in the light most favorable to Plaintiffs, the Court

1  may draw the reasonable inference that Defendants made the false or misleading statement that

2  YMTC was engaged in criminal activity through "a Social Security spoofing scam, identity theft,

3  and cyber extortion." *Dassault*, 2008 WL 6742224 at *4 ("At this stage of a motion to dismiss, all

4  inferences are to be drawn in [Plaintiffs'] favor.").

5        Defendants' attempt to cabin these statements as "non-actionable opinions" or merely

6  "hypotheticals" (Mot. 23–24) is inappropriate.  Each of these accusations is capable of being

7  prove[n] false or of being reasonably interpreted as a statement of objective fact.  *Ariix*, 985 F.3d

8  at 1121–22 (finding that "[a]n actionable statement is a specific and measurable claim, capable of

9  being proved false or of being reasonably interpreted as a statement of objective fact.").

10  Defendants' statements about Plaintiffs are "specific, measurable, and capable of being proven

11  false;" they are thus actionable for a false advertising claim under section 1125(a).  *Id.* at 1122.

12  **VI.**      **IF NECESSARY, THE COURT SHOULD GRANT LEAVE TO AMEND.**

13        Should this Court find any deficiency in the FAC, Plaintiffs respectfully request leave to

14  amend.  The Ninth Circuit has endorsed "extreme liberality" in granting leave and reserving

15  dismissals with prejudice for extraordinary cases.  *Wininger v. SI Mgmt., L.P.*, 33 F. Supp. 2d 838,

16  844 (N.D. Cal. 1998) (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)).

17  Dismissal without leave is improper unless amendment would be futile.  *Jackson v. Carey*, 353

18  F.3d 750, 758 (9th Cir. 2003).  That is reflected in the cases Defendants cite, where courts

19  routinely grant leave to amend.  *See, e.g.*, *HomeLight, Inc.*, 694 F. Supp. 3d at 1257 (granting

20  leave to amend to cure defects in Lanham Act claim); *Allbirds*, 2020 WL 6826487, *4 (granting

21  leave to amend to cure defects in Article III standing).  Although Plaintiffs believe the FAC is

22  sufficient, they are prepared to amend to provide additional detail, if the Court deems it necessary.

23  **CONCLUSION**

24        For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

25

26

27

28

1   DATED:  January 7, 2025                    Respectfully submitted,

2                                              QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP
3

4                                              By
                                                     Robert M. Schwartz
5                                                    *Attorneys for Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT