# Exhibit C

archive.today
webpage capture

**Saved from** https://www.bloomberg.com/news/features/2018-01-25/how-hedge-funds-se    search
**All snapshots** from host www.bloomberg.com

29 Jan 2018 00:08:09 UTC

◷ history  ←prior next→

| Webpage | Screenshot |

◯ share    ⬇ download .zip    💡 report bug or abuse

Bloomberg the Company & Its Products    |    Bloomberg Anywhere Remote Login    |    Bloomberg Terminal Demo Request

**B** Home

**Bloomberg Businessweek**     

Thursday, January 25, 2018 10:00:16

# How Hedge Funds (Secretly) Get Their Way in Washington

Fake grass roots. An inflatable rat. Testimony with hidden ties. Billionaires are using DCI Group to make their bets pay off—while keeping the public in the dark.



▲ An inflatable rat with a sign referring to Argentina at a 2012 protest in Washington outside a conference of the Council of the Americas.    PHOTOGRAPHER: NICHOLAS KAMM/AFP/GETTY IMAGES

By Zachary Mider and Ben Elgin

With swept-back silver hair and a prestigious résumé, James K. Glassman cuts the classic figure of a Washington wise man. He's a former undersecretary of State, think-tank founder, and best-selling author, with a considered opinion on just about any Beltway issue. In July 2014, when a House subcommittee held a hearing on Latin American economies, its members asked Glassman to speak first. "Thank you, Mr. Chairman," he said, and began to testify: "A stable and prosperous Latin America is critical, not just to Latin Americans themselves, but to all of us here in the United States. ..."

Glassman, wearing a dark suit and purple tie, added to the record some very specific ideas. First he charged Argentina with trying to renege on its debt, and then he accused Puerto Rico of the same thing. Then he highlighted a Caribbean tax dispute. Then he gave a shout-out to former bondholders of General Motors Co.

If Washington can be thought of as a factory, opinions like these are the raw materials that get turned into laws, regulations, and public policy. Their provenance matters. Glassman never mentioned it in his testimony, but records show he was then working for an affiliate of DCI Group—a Washington public affairs firm whose client list meshed perfectly with his talking points. One DCI client, a $25 billion hedge fund, was feuding with Argentina. Another was suing Puerto Rico. DCI had also lobbied on the tax dispute and the GM issue.

Glassman, 71, who said in an email that he stands by his testimony, is a key asset in a furtive campaign by Wall Street to bend the political process. Over the past two decades, hedge funds have grown explosively, with a collective $3.4 trillion under management. Not content to make bets and watch from the sidelines, the largest funds increasingly are trying to steer government outcomes—such as negotiations over sovereign debt—so that their investments are likelier to pay out. When billions are at stake on a given wager, a lobbying campaign looks cheap. But hedge funds know that they're politically toxic—portrayed by both parties as overpaid plutocrats—and prefer that much of these offensives be conducted in secret. That's where DCI comes in, providing credible-seeming voices to speak up for the funds' interests—

voices like Glassman's. It's not illegal, but it undermines basic principles of transparency and trust.

Since the work is concealed, there's no way to know for sure how many hedge funds are leveraging Washington to benefit their portfolios. But interviewing insiders and scouring public records, *Bloomberg Businessweek* identified six major influence campaigns waged on behalf of investors in a particular stock or bond since 2006. DCI, it turns out, coordinated all six.



James Glassman.   SOURCE: AMERICAN ENTERPRISE INSTITUTE

The campaigns are remarkably similar. Behind the scenes of official Washington, the company repeatedly crafted narratives portraying investors as victims of corrupt governments. DCI rounded up ordinary Americans who agreed with its clients and marched them into lawmakers' offices to lend a veneer of grass-roots support. Meanwhile, Glassman and other ostensibly independent intellectuals blanketed panels, hearings, and press conferences with the same storyline, without ever mentioning their connection to DCI or the hedge funds. If all went well, the targets of these campaigns–administration officials, media "thought leaders," and lawmakers–didn't know they were being lobbied, much less who paid for it.

It certainly worked at the Latin America hearing in 2014. "If you have other thoughts," Representative Matt Salmon (R-Ariz.) told Glassman, "and if you wanted to draft a memo for members of this committee, I promise you we will put it to good use." Salmon told *Bloomberg Businessweek* this month that he had no inkling of Glassman's links to hedge funds.

Filtered into Glassman's pithy remarks, the funds' money had slipped undetected into the Washington supply chain.

Corporations have long used astroturfing–spending money behind the scenes to create the appearance of authentic support–to advance their interests. What hedge funds are up to now builds on the shady practice and almost makes it seem quaint. Big companies have thousands of employees and millions of customers; what's good for them might benefit their stakeholders too, and the companies' priorities are basically stable over time. Hedge funds are different. They employ relatively few people, and much of their economic success accrues to their owners, a tiny group of centimillionaires and billionaires. A hedge fund might be for a given policy today and against it tomorrow, driven by prices on a screen. It's another way in which skyrocketing inequality is giving a few individuals an outsize role in public life.

The financiers' essential partner in this feat is DCI, long a go-to Washington firm for astroturfing. (The corporate field has dozens of competitors, from large public-relations shops to boutiques, some of them started by DCI alumni.) The company was founded in 1996 by three veterans of R.J. Reynolds Tobacco Co., including Thomas Synhorst, whom one left-leaning publication nicknamed the "Johnny Appleseed of astroturf." Synhorst, who along with his company declined to comment for this story, remains one of a small group of partners overseeing more than 140 employees in Washington and Brussels. According to one staffer's LinkedIn page, annual revenue is more than $60 million. For more than a decade, a linchpin of DCI's ability to alter the terms of debate in Washington has been James Glassman.

Raised in D.C., Glassman came up through the media ranks–publisher of the *New Republic*, editor of *Roll Call*–and co-wrote the 1999 book *Dow 36,000*, an instant icon of dot-com cheerleading. The next year, he launched *Tech Central Station*, an online publication focused on technology policy that he called "a kind of watchdog in an area in which few people seem to be doing long-term principled thinking." Before long, *Washington Monthly* revealed that the site wasn't straight journalism but rather a lobbying operation in disguise, controlled by DCI's partners and consistently pushing issues that aligned with clients such as Microsoft Corp. and AT&T Inc. The magazine credited Glassman with inventing a new form of influence peddling: "idea laundering." (In his emailed statement, Glassman declined to discuss his relationship with DCI but said that his writing, speeches, testimony, and other work have been "consistent with my long-held beliefs. ... Decisions on whether to write something–and how to write it–are my own, and I stand behind what I write.")

Between the *Washington Monthly* exposé and the dot-com crash, Glassman's career might have been over. But D.C. just shrugged. He was soon appointed to a government post overseeing Voice of America, then joined the U.S. Department of State at ambassador rank.

Upon leaving office in 2009, Glassman became president of a DCI front group called World Growth Institute. That spring he turned his attention to GM, criticizing the Obama administration's handling of the carmaker's bankruptcy in a *New York Times* op-ed. His words echoed those of an organization known as GM Main Street Bondholders–in theory a bunch of ordinary investors who were holding rallies around the country. Emails obtained by *Bloomberg Businessweek* show that DCI was organizing the campaign, and in recent interviews, some of the group's leaders said they had no idea who was paying DCI's bills. (A *Times* spokesman declined to comment on Glassman's piece but



General Motors retiree Mal Hanson and his wife, Marie, hold hands at a news conference in Michigan in 2009. The event was set up by GM Main Street Bondholders, a group organized by consultants at DCI.    PHOTOGRAPHER: PAUL SANCYA/AP PHOTO

said the paper always asks contributors to disclose financial interests.)

Over the years, as Glassman has shuttled from one DCI front to another, he's opined on a staggering array of issues, often with a take that coincides with the interests of a DCI client. He's defended the Asian palm oil industry, praised a Congolese mining magnate, and testified before Congress in favor of policies that benefit Nasdaq Inc.—all DCI clients at the time.

One of the longest-running themes in Glassman's commentary has been the plight of Argentine bondholders. After the country defaulted in 2001, most investors accepted a deal to exchange their bonds for cheaper securities. But Paul Singer, the billionaire chief of hedge fund Elliott Management, didn't. He took Argentina to court to get full value—a long-shot move that could generate a huge profit.

For Singer, DCI mounted an influence campaign that would stretch a decade and target all three branches of government, becoming a template for later projects. Tax documents show that DCI earned at least $16 million from its Argentina work in one four-year period. Its job was to reshape official opinion in Washington and Europe, and here Singer had a big disadvantage: Argentina's president was portraying him as a "vulture" investor profiting from the misfortunes of the poor.

DCI worked to shift the focus from Singer. In court, it helped round up briefs from allies to create a sense of broad support beyond Wall Street. It started a coalition, American Task Force Argentina, with dozens of members—including

some not usually identified with sovereign-debt disputes, such as the National Grange, a farmers' fraternal order, and the Colorado branch of the American Association of University Professors. (It's not clear that all the members knew of their participation. At least three now say they never agreed to join ATFA.) Separately, a motley consortium–ranging from a Tea Party-aligned group to the National Black Chamber of Commerce–wrote letters to lawmakers and issued public statements.

It sounds almost innocuous. But much of Washington policymaking originates with such activity among wonks: the network of nonprofits, think tanks, and advocacy groups that help the political parties generate ideas, set priorities, and gain expertise. Unlike campaign donations or formal lobbying, money spent here is rarely disclosed. If an idea is suddenly getting attention in policy circles, it's usually impossible to know whether a few well-placed donations from hedge funds greased the way.

According to two former DCI employees who requested anonymity to speak freely about the company, a unit called Strategic Alliances maintains ties with dozens of nonprofits and advocacy groups, regularly contributing money and then requesting their assistance on projects. Another former DCI employee describes joining the company from the ranks of the wonks. Once at DCI, he was awed to learn how many Washington-area nonprofit staffers, policy experts, and even journalists were secretly fed lines by his new employer. He came to see his former colleagues as puppets–and he had become the one with his hand on the strings.

In May 2012, outside a Washington conference where Argentina's vice president was scheduled to speak, a large inflatable rodent appeared, wearing an Argentine flag and holding a sign in its claws: "I'm the rat in the G20." A month later, the same message–that Argentina didn't belong in the G-20 group of nations–appeared in a report published by the National Taxpayers Union, a Washington nonprofit. The report's co-author was Glassman, who publicized it with pieces in the *Wall Street Journal* and *Foreign Policy*. The study and op-eds didn't disclose any connections to hedge fund money. But one person with knowledge of the matter says DCI employees planted the rat and arranged for the NTU to be compensated. (A spokesman for the *Journal* said Glassman has assured the publication he wasn't representing DCI or a hedge fund. *Foreign Policy* declined to comment. Pete Sepp, president of the NTU, said he can't discuss donors but that his organization isn't "a pay-to-play operation, period.")

As the Argentina battle started to tilt Singer's way, DCI pitched its skills to more hedge fund clients. Paulson & Co., run by New York billionaire John Paulson, hired the firm for a campaign supporting his investment in Fannie Mae and Freddie Mac, according to a person with knowledge of the matter. (Paulson declined to comment.) Other funds that owned Puerto Rican debt signed on. The hedge fund Autonomy Capital sought help in a fight over Icelandic bonds, a person with knowledge of that assignment says. In each case, Glassman helped lead the charge.

In 2013, Glassman announced he was joining a consulting firm called Public Affairs Engagement LLC as chief executive officer. Registration records show it was set up by Synhorst and DCI's corporate secretary. According to two former DCI employees, PAE had office space inside DCI's Washington headquarters, where Glassman regularly reported to work.

As Glassman championed more hedge fund campaigns, his advocacy sometimes clashed with his own previous views. In a memo he gave lawmakers at the 2014 Latin America hearing, he recommended that Puerto Rico be allowed to declare bankruptcy. But he insisted the island's electric utility shouldn't; at the time, DCI was representing BlueMountain Capital Management, an owner of the utility's bonds. A year later, he reversed himself, declaring that a Puerto Rico

bankruptcy would be a "disaster." Not long after, DCI started a campaign for bondholders that would lose value in such a bankruptcy. (In his statement, Glassman said that "we all strive for consistency, but the facts on the ground in Puerto Rico changed.")

Thanks to a string of court victories, Singer prevailed against Argentina in 2016, earning his fund more than $2 billion in profit. (In a statement, Elliott noted that thousands of bondholders and pensioners also benefited.) Other DCI projects haven't gone so well. Congress allowed Puerto Rico to declare bankruptcy, and Fannie Mae shareholders have failed to get the government to come to their aid. A major obstacle has been Senator Bob Corker, who wrote a bill that would wind down the company. Through a shareholder group that it helped set up, DCI has promoted reports of ethical lapses by the Tennessee Republican. "It's been pretty shocking to me," Corker said at a 2016 hearing, "to see the lengths that some hedge funds will go to try to shape public policy in a manner that might reap huge benefits."

Thanks to DCI—and a lack of rules around disclosure—there are few limits to how far hedge funds can take this practice. One of the company's more incongruous assignments to date was the case in Iceland, where Autonomy Capital went to court in 2016 to challenge the government's treatment of foreign investors. Institute for Liberty, the Tea Party-aligned group that previously advocated on Argentina, set up a website and a Facebook page called Iceland Watch that advocated for the funds' position. Glassman hosted a panel discussion in New York and attacked Iceland's position in the *Journal* and Bloomberg View. (Bloomberg LP, which owns that site and this magazine, said it requires op-ed writers to disclose relevant financial interests.) More voices piped up, most of them recognizable from the Argentina campaign. DCI operatives began showing up at Reykjavik's swankiest hotels and hiring local consultants for political guidance. Before a 2016 parliamentary election, Iceland Watch bought full-page ads in Reykjavik newspapers hinting at misconduct by a central bank official.

The ads, <u>translated poorly</u>, may have done more harm than good. (The only wrongdoing they revealed, one wag commented online, was "a crime against the Icelandic language.") But in the end, Iceland settled with the foreign funds last year on more favorable terms. Autonomy, which took the improved deal, declined to comment, and Institute for Liberty didn't respond to inquiries.

Glassman and the other pundits didn't take a victory lap. They simply went silent. A Reykjavik reporter noticed his DCI contact suddenly stopped returning calls. The Iceland Watch website disappeared, and its social media accounts were erased. The money had done its work, and DCI was off to its next assignment.

Terms of Service    Trademarks    Privacy Policy
©2018 Bloomberg L.P. All Rights Reserved
Careers    Made in NYC    Advertise    Ad Choices
Website Feedback    Help